Liz Boydston (SBN 24053684)
Savanna Barlow (SBN 24109617)
Trinitee G. Green (SBN 24081320)
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
lboydston@polsinelli.com
sbarlow@polsinelli.com
tggreen@polsinelli.com

Jeremy R. Johnson (*Pro Hac Vice* pending)
Stephen J. Astringer (*Pro Hac Vice* pending)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Abri Health Services, LLC, *et al.*,[1] | § | Case No. 21-30700 (sgj) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

**DECLARATION OF KEVIN O'HALLORAN, CHIEF EXECUTIVE
OFFICER OF ABRI HEALTH SERVICES, LLC, IN SUPPORT OF
SUBCHAPTER V OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Kevin O'Halloran, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer ("**CEO**") of Abri Health Services, LLC ("**Abri**") and Senior Care Centers, LLC ("**SCC**," and together with Abri, the "**Debtors**") in the above-captioned subchapter V cases (collectively, the "**Cases**"). I have served as CEO of the Debtors since March 2021. I previously served as Chief Restructuring Officer of SCC and its 128 affiliated debtor entities during their prior chapter 11 proceedings.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Abri Health Services, LLC (3319) and Senior Care Centers, LLC (8550).

2.     In my capacity as CEO of the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors. As CEO, I am authorized to make this declaration (the "**Declaration**") on behalf of the Debtors. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of these Cases and in support of the petitions and first day pleadings.

### Preliminary Statement

3.     After emerging from their hard-fought chapter 11 cases in March 2020, the Debtors experienced significant distress in responding to the global COVID-19 pandemic like all other senior living facilities nationwide. Despite the devastating impact the pandemic had and continues to have, the Debtors were able to remain current with each of their landlords throughout the pandemic until recently. Only last month, after a buyout from new investors, did the Debtors make the business decision that certain of their operations were no longer sustainable during the pandemic.

4.     Despite efforts to consensually resolve these issues with one of their landlords, the Debtors were unfortunately forced to seek bankruptcy protection to resolve their potentially devastating liabilities.

## I.     EVENTS LEADING TO THE FILING OF THESE CHAPTER 11 CASES

5.     As this Court is well aware, in SCC's prior Chapter 11 cases, SCC struggled to resolve disputes with several landlords and was forced to litigate with several of its landlords to achieve a successful reorganization. SCC pared down its sprawling pre-bankruptcy platform of more than 100 skilled nursing facilities ("**SNFs**") across various states to approximately 22 of its

best-performing facilities operating only in Texas. SCC emerged from bankruptcy and substantially consummated its plan in March 2020.

6.     Since that time, the Company has grappled with the COVID-19 pandemic, which has had a devastating impact on SNFs—an industry that was already experiencing significant challenges and financial distress. It is no secret that in 2020, nearly 50% of U.S. COVID-19 deaths were among nursing home residents and staff. While this percentage has steadily decreased to 33% in 2021, the AARP Nursing Home COVID-19 Dashboard, which was created by the AARP Public Policy Institute and the Scripps Gerontology Center at Miami University in Ohio, reported on April 15, 2021 that "the COVID-19 pandemic has swept the nation, killing more than 182,000 residents and staff of nursing homes and other long-term care facilities."[2] In response to these hauntingly high numbers, the U.S. Government, the U.S. Department of Health and Human Services (**HHS**), Centers for Medicare & Medicaid Services (**CMS**), the Centers for Disease Control & Prevention (**CDC**), and the Office of the Assistant Secretary for Health (**OASH**) all took action to address critical needs in nursing homes.

7.     Despite weathering much of the pandemic, the Company has been experiencing significant financial difficulty. Due to these unforeseeable events, the management and the Board began the ongoing process of evaluating the Company's existing business beginning in October 2020.

8.     On December 17, 2020, LTC Properties ("**LTC**"), the parent of landlord TXMS Real Estate Investments, Inc. ("**TXMS**," and hereinafter LTC and TXMS will collectively be referred to as "**TXMS**"), publicly announced they would be providing relief to their operating partners:

---

[2]     https://www.aarp.org/ppi/issues/caregiving/info-2020/nursing-home-covid-dashboard.html

77548653

> Our operating partners have done a tremendous job of caring for their residents and patients during the COVID-19 crisis," said Wendy Simpson, LTC's Chairman and CEO. "After listening carefully to their needs, and to give back to our industry, we are providing partial relief from 2021 rent escalations so that our operating partners have additional funds at a time during which they need them most. This additional assistance will help our partners as they continue to deliver outstanding and safe care to our nation's seniors.[3]

9.      In December 2020, the Debtors reached out to TXMS to inform it of the Company's financial and operating concerns and sought rent relief from the existing lease arrangement. TXMS refused to provide the Debtors with any of the COVID-19 relief it offered to its other operators—citing as its basis for denying relief that the Debtors "forced TXMS to spend legal fees" in a lawsuit **that TXMS itself initiated**, *TXMS Real Estate Investments, Inc. v. Senior Care Centers, LLC, Abri Health Services, LLC and Alan Halperin (In re Senior Care Centers, LLC)*, Adv. No. 20-03073 (the "**Recent Litigation**").[4] As this Court is keenly aware, TXMS engaged in vexatious litigation with the Company (and their predecessors) for more than two years, the most recent of which this Court called "a collateral attack on the [SCC] Confirmation Order" less than five months ago in its November 12, 2020 Memorandum Opinion issued in the Recent Litigation at [Dkt. No. 44] at p. 14.

10.     On March 1, 2021, new investors in the Company funded a buyout of the equity and the note held by the liquidating trust formed on SCC's exit from bankruptcy. The Debtors' executive team, Board, and the new management group determined that certain of the Company's operations had deteriorated significantly because of the pandemic, and the decision was made to request a 40% rent concession *from all of the Debtors' landlords*.

---

3       https://www.businesswire.com/news/home/20201217005155/en/LTC-Reduces-2021-Rent-Escalations

4       TXMS initially filed the lawsuit in Texas State Court on April 13, 2020, and the Debtors removed the action to this Court.

4

11.     Accordingly, on or about March 1, 2021, the Debtors began contacting each of their landlords, including TXMS, to inform them about the equity buyout, the Company's financial concerns about being able to make rent, and to continue their on-going discussions concerning the Company's need for rent concessions.

12.     On or about March 2, 2021, the Debtors spoke with their other landlords and received rent concessions of between 10-40%. These rent concessions from the Company's other landlords began April 1, 2021.

13.     On March 3, 2021, the Debtors engaged in conversations with TXMS. The Debtors had previously sent an agenda to TXMS for the March 3rd call. The agenda items were a) the equity buyout, b) requests for rent concession due to financial distress, and c) options going forward.

14.     In the March 3rd discussion with TXMS, the Debtors explained the Company's financial concerns, including the fact that it could not make the full March rent payment, and re-requested rent concessions from TXMS. The Debtors indicated their hope to continue the working relationship with TXMS but stated that due to the last two years of contentious litigation and TXMS's allegations in the Recent Litigation, the Debtors only wanted to continue such relationship if TXMS would a) provide significant rent relief and b) stop any further contentious litigation.

15.     TXMS was not interested in providing rent concessions to the Debtors.

16.     Thus the Debtors stated that they would be willing to consensually turn over a portion of the Company's valuable operations (the 11 TXMS Facilities) to TXMS if the parties could agree on a reasonable operations transfer agreement ("**OTA**"). TXMS responded that it would be willing to take the 11 TXMS Facilities.

5

17.     On March 9, 2021, TXMS sent a Notice of Default to the Debtors based on the Debtors' failure to pay March rent. The Debtors had a call with TXMS and notified TXMS that counsel for the Debtors would draft and send an OTA and a draft settlement agreement ("**Settlement Agreement**") to TXMS.

18.     In fact, on March 9, 2021, the Debtors publicly announced that the Company planned to transition operation of the TXMS Facilities.[5] Similarly, on March 11, 2021, TXMS announced that it would be taking over and transitioning the operations of the TXMS Facilities to HMG Healthcare.[6]

19.     The Debtors immediately began working with TXMS and HMG Healthcare (the proposed new operator), sending over a non-disclosure agreement ("**NDA**") and a HIPAA Business Associate Agreement ("**BAA**") so that the Debtors could provide HMG Healthcare with necessary data, information, financials, A/R, etc. about the relevant Facilities. The Debtors set up a data room for HMG Healthcare and its advisors and counsel to access. Substantial amounts of data were uploaded to the data room—everything that TXMS and HMG Healthcare requested, the Debtors uploaded to the data room—through and including the week ending April 16, 2021.

20.     The Debtors, TXMS, and HMG Healthcare had weekly calls about the consensual transfer beginning on March 15, 2021. Those calls occurred up and through April 14, 2021.

21.     To facilitate the consensual turnover, on March 23, 2021, the Debtors sent TXMS a draft OTA. Counsel to the Debtors also sent counsel to TXMS a Settlement Agreement on

---

[5]     As part of the launch, the company has determined it will no longer seek to operate 10 facilities owned by LTC Properties, which have previously been the subject of a dispute," Abri disclosed in the statement.

[6]     https://skillednursingnews.com/2021/03/ltc-properties-to-transition-11-abri-senior-care-centers-snfs-to-hmg-healthcare-after-default/

March 26, 2021. As of the Petition Date, neither the Debtors nor their counsel ever received a response to either draft.

22. In the spirit of expected mutual cooperation, as part of their weekly calls with TXMS and HMG Healthcare, the Debtors informed TXMS and HMG Healthcare that a few senior and administrative positions in certain TXMS Facilities needed to be filled, and the Debtors invited HMG Healthcare to provide input and be a part of the hiring process since the Debtors expected HMG Healthcare to become the new operator.

23. Despite what the Debtors perceived as a high level of cooperation and coordination among the parties, and notwithstanding the weekly transaction call with TXMS and HMG Healthcare that occurred on April 6, 2021, in a letter **dated the very next day**, April 7, 2021, TXMS unilaterally sent the Debtors a Notice of Termination (the "**Termination Notice**") of the Third Amendment to Second Amended and Restated Master Lease Agreement (the "**Master Lease**") and demanded that the Company immediately execute 11 burdensome Operation Transfer Agreements (the "**Surprise OTAs**"), none of which the Debtors or their counsel had reviewed or negotiated. The Debtors did not receive the Termination Notice until April 9, 202, and the Termination Notice stated that the Master Lease would be terminated on April 17, 2021.

24. The Surprise OTA's contemplated that operations of the TXMS facilities would be transferred to the Winnie-Stowell Hospital District rather than HMG Healthcare, although HMG Healthcare would be the manager of the facilities. Despite the transaction call with TXMS and HMG Healthcare on April 6, 2021, this was the first time the Debtors (or their counsel) learned of TXMS's involvement with the Winnie-Stowell Hospital District. **Of concern is the**

7

**fact that the Debtors do not have a HIPAA BAA or any other NDA with or concerning Winnie-Stowell Hospital District**.

25. Summarily, these Surprise OTAs mandate that the Debtors or their affiliates transfer the operations of the 11 TXMS facilities for no consideration and require that the Debtors guarantee all liabilities related to the OTA's at the parent level, thus exposing the rest of the Company (including the non-TXMS Facilities) to significant potential liabilities. In addition to demanding that the Debtors transfer their business for no consideration, TXMS continues to insist that the Debtors have an obligation to pay the full amount of all of TXMS's alleged claims under the Master Lease (potentially $64 million).

26. The Debtors spoke with TXMS on April 14, 2021 requesting TXMS withdraw or otherwise re-issue the Termination Notice so that the parties can resurrect negotiations toward a consensual transfer of operations. On April 15, 2021 the Debtors once again followed up requesting a standstill from TXMS. On April 16, 2021 at approximately 12:36 p.m. central time, TXMS responded that it was "not willing to withdraw the notice of termination. However, we remain open to discuss an amicable resolution to the parties' differences concerning surrender of the Facilities and transition of operations."

27. The Debtors filed these cases to (a) try to protect their business from further economic distress and preserve the value of the business (including but not limited to the value of the 11 facilities not leased from TXMS) for all creditors; (b) use the automatic stay to provide the Debtors with a "breathing spell" during which it hopes TXMS will come to the table and negotiate a reasonable resolution; and (c) enable the Debtors to transition its underperforming facilities to a new operator or, if necessary, allow for an orderly wind down of one or more facilities.

8

## II. THE DEBTORS' BUSINESS

28. The Debtors manage, oversee, audit, and provide ancillary services to 28 subsidiaries that operate 21 skilled nursing facilities ("**SNFs**") and one assisted living facility (collectively, the "**Facilities**," and together with the Debtors, the "**Company**") around Texas. None of the subsidiaries or Facilities are debtors. The Facilities provide care on a daily basis to approximately 2,000 patients.

29. As of the Petition Date, the Debtors employ 67 full-time employees (the "**Employees**") and three 1099 intendent contractors – all of whom work at the Debtors' corporate headquarters located in Dallas, Texas.

### A. Corporate History and Organizational Structure.

30. Abri is a Delaware limited liability company that was formed on November 1, 2019 in anticipation of confirmation of the *Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* filed in Case No. 18-33967, *In re Senior Care Centers, LLC, et al.*

31. Abri was incorporated on December 31, 2019 and is both Manager and Sole Member of and owns 100% of SCC.

32. Organizational charts reflecting the Company's organizational structure are attached hereto as Exhibit A.

33. SCC became a reorganized debtor on March 27, 2020.

34. SCC is both Manager and Sole Member of and owns 100% of the non-debtor subsidiary entities Senior Care Center Management LLC and CTLTC Real Estate, LLC.

35. SCC is both Manager and Sole Member of and owns 85.09% of non-debtor subsidiary entity Senior Rehab Solutions LLC.

9

36. SCC is the sole member and owns 100% of 12 wholly-owned subsidiary facilities. None of the wholly-owned subsidiary facilities are debtors.

37. In response to receipt of the TXMS Termination Notice and the Surprise OTAs, the Board appointed an independent director (the "**Independent Director**" and formed a special committee of the independent director (the "**Independent Committee**") to help review and evaluate its strategic alternatives.

38. As of the Petition Date, the Board consists of two members: Anthony Arnaudy, who is also the Debtors' Chief Financial Officer, and Monica Blacker, the Independent Director.

### B. Business Operations

39. Abri is responsible for performing, on behalf of both the corporate operations and the 22 operating facilities, the following business functions:

   a. Managing insurance procurement and claims;
   b. Handling training, human resources, and payroll for corporate and operating facilities;
   c. Monitoring and supervising patient care at operating facilities;
   d. Managing purchasing, utilities, and service contracts for operating facilities;
   e. Providing various information technology services, including software licenses, maintenance, and upgrades;
   f. Organizing patient records for operating facilities (but no records are held by the Debtors);
   g. Negotiating and administering pharmacy contracts;
   h. Preparing and filing taxing returns;
   i. Compliance; and
   j. Preparing Medicaid, Medicare, and other reimbursements.

40. The Debtors receive revenue from various sources, primarily: (a) Medicare reimbursements; (b) Medicaid reimbursements; and (c) other third party and private payors. The Debtors use the revenue generated by the receipt of daily basic rates and fees to fund their daily operations, make rent payments, and make capital improvements to the Facilities.

77548653

C.    **Regulatory Agencies**

41.    Operators of SNFs and assisted living facilities are heavily regulated by various state and federal agencies. In particular, nearly every aspect of the operation of the facilities, including financial operations are subject to rules and regulations promulgated by: (a) the United States Depart of Health and Human Services' Centers for Medicare & Medicaid Services; (b) the Department of Aging, Office of Health Assurance and Licensing, Bureau of Long Term Care, Bureau of Regulatory Enforcement; and (c) the applicable departments of health in Texas and Louisiana.

D.    **Assets and Liabilities**

(i)    **Liabilities**

42.    As of the Petition Date, the Debtors estimate they owe an aggregate of approximately $2,672,858.02 million in unsecured trade debt.

43.    The Debtors have no secured debt.

(i)    **Assets**

44.    As of the Petition Date, on an unconsolidated basis, the Debtors have approximately $3,555,000 in total assets.

II.    **FIRST DAY PLEADINGS**

45.    Contemporaneously herewith, the Debtors filed the following First Day Pleadings:

        a. Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Their Chapter 11 Cases, and (II) Granting Related Relief (the "**Joint Administration Motion**");

        b. Motion of Debtors for Entry of an Order Extending Time For Filing Schedules of Assets and Liabilities and Statement of Financial Affairs (the "**Schedules Extension Motion**");

c. Motion of Debtors for Entry Of Interim And Final Orders Authorizing Payment Of (I) Certain Prepetition Workforce Claims, Including Wages, Salaries, And Other Compensation, (II) Certain Employee Benefits And Confirming Right To Continue Employee Benefits On Postpetition Basis, (III) Reimbursement To Employees For Prepetition Expenses, (IV) Withholding And Payroll Related Taxes (V) Worker's Compensation Obligations, And (VI) Prepetition Claims Owing To Administrators And Third Party Providers (the "**Wages Motion**");

d. Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (II) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "**Utilities Motion**");

e. Motion of Debtors for Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies from Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief from the Automatic Stay, and (IV) Authorizing the Debtors to Continue to Honor Premium Financing Obligations (the "**Insurance Motion**");

f. Motion of Debtors for Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices (the "**Cash Management Motion**"); and

g. Motion of Debtors for Entry of an Order Determining That Appointment of a Patient Care Ombudsman is Not Required in These Cases (the "**Ombudsman Waiver Motion**").

46. The Debtors seek the relief set forth in the First Day Pleadings to minimize the disruption to and adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of their assets. I have reviewed the Debtors' petitions and the First Day Pleadings, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

77548653

47.     References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience in other healthcare restructurings. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

48.     Contemporaneously with the filing of their chapter 11 petitions, the Debtors seek approval of the First Day Pleadings and related orders (the "**Proposed Orders**"). The Debtors respectfully request that the Court enter each of the Proposed Orders as they are critical to the Debtors' successful reorganization in these Chapter 11 Cases.

49.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

A.      **The Joint Administration Motion**

50.     Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their two (2) subchapter V Cases for procedural purposes only. Many of the motions, hearings, and other matters involved in the Cases will affect both of the Debtors. Therefore, I believe that the joint administration of these two cases will avoid the unnecessary time and expense of duplicative motions, applications, and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

13

Accordingly, I believe the Court should approve the joint administration of these subchapter V Cases.

### B. The Schedules Extension Motion

51. Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the deadline to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by an additional 16 days, from the date such Schedules and Statements are otherwise required to be filed, for a total of 30 days from the Petition Date.

52. I believe cause exists to extend the deadline for filing the Schedules and Statements. As detailed herein, the Debtors have had limited time to prepare to file these Cases. Given the amount of work required to complete the Schedules and Statements, and the competing demands on the Debtors' Employees and professionals to continue to maximize the Debtors' business operations during the initial phase of these Cases and to provide continued support to the Debtors' efforts to execute a restructuring strategy, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the initial fourteen-day period prescribed by Bankruptcy Rule 1007(c). To completely and accurately file Schedules and Statements, the Debtors must collect, review, and analyze a substantial amount of information.

53. As stated above, the Debtors only received the Termination Notice on Friday, April 9, 2021. The Debtors forwarded the Termination Notice to their counsel on Friday afternoon. Over the weekend, the Debtors' management met with their new equity and decided to appoint an independent director. So for the five days prior to the Petition Date, the Debtors and their counsel focused extensively on preparing for the filing and transitioning the business into the chapter 11 process while at the same time requesting TXMS withdraw or otherwise re-

14

issue the Termination Notice for an additional week to 10 days so the parties could resurrect negotiations. The Debtors are working expeditiously to prepare and file their Schedules and Statements, and I believe that Schedules and Statements will be filed as soon as possible. Notwithstanding, in an abundance of caution, it is in the best interests of the Debtors to respectfully request an extension of 16 days.

### C. The Wages Motion

54.     Pursuant to the Wages Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay accrued prepetition wages, salaries, and other compensation to their Workforce; (ii) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off policies, severance practices, and employee benefit plans and programs; (iii) reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis; (iv) pay all related prepetition payroll taxes and other deductions; and (v) honor worker's compensation obligations and related obligations, all in accordance with prepetition practices, and as described in further detail in the Wages Motion.

55.     In connection with the operation of their businesses, the Debtors currently employ approximately: 42 full-time salaried Employees and 25 full-time hourly Employees.

56.     The Employees are critical to the Debtors' business, and their value cannot be overstated. To a significant extent, given the Debtors' managerial role in managing the Company and providing ancillary services for healthcare facilities, the long-term prognosis of patients depends on the Debtors' ability to attract and retain qualified personnel. The loss of certain Employees will impede the Debtors' business and seriously harm the ability to successfully implement their bankruptcy strategy. Further, replacing Employees can be difficult for the

Debtors given the limited number of individuals in their industry with the breadth of skills and experience required to successfully navigate the senior care space, where experienced employees are at a premium.

57.     If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations, certain Employees will likely seek employment elsewhere. Indeed, many of the Employees were employed by Debtor SCC during the pendency of a previously filed bankruptcy case, as discussed more fully herein. Thus, these Employees will be particularly concerned if they are not assured that Employee Obligations will not be met in the ordinary course.  The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through these Cases.

58.     The Debtors also utilize the services of contract workers ("**Contractors**" and, together with the Employees, the "**Workforce**") to provide a variety of services. There are currently three (3) Contractors, who provide the Debtors with a range of functions, both operational and administrative, including financial reporting.

59.     The Contractors fill certain critical and immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet certain business needs in a cost-effective manner. The Contractors are a reliable and cost-efficient component of the Debtors' business. Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations to the Contractors, it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business and ability to manage and provide services to the SNFs.

60. The Debtors' Employees are paid in arrears on a bimonthly basis for pay periods of: (a) the 1st through the 15th day; and (b) the 16th through the last day of the month. Immediately following each regular pay date, Employees are owed for approximately one week of earned but unpaid compensation, and payroll obligations are funded by Debtors approximately two days before each regular pay date.

61. On average, per pay date, the Debtors' payroll obligations with respect to the Employees is approximately $197,285.23, plus applicable employer-paid payroll taxes of approximately $19,610.95 related to such earnings. The last payroll date before the Petition Date was approximately April 9, 2021, and the Debtors paid payroll obligations for work completed through March 31, 2021. The next payroll date will be approximately April 23, 2021, and the Debtors' payroll obligations will include work completed from April 1, 2021 through April 15, 2021. The Debtors estimate that as of the Petition Date, approximately $270,200 has accrued and remains unpaid, which includes gross wages and compensation earned and employer-paid payroll taxes related to such earnings (the "**Employee Compensation Obligations**").

62. The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations. In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

63. As stated above, the Debtors utilize the Contractors in the ordinary course of business. As of the Petition Date, the Debtors estimate that the aggregate amount owing on account of the Contractors for services performed prior to the Petition Date is approximately $19,500 (the **"Contractor Obligations"** and together, with the Employee Compensation

17

Obligations, the **"Compensation Obligations"**). The Debtors would be irreparably harmed without the services of the Contractors because such parties play a critical role in the Debtors' business, and, as such, the Debtors request authorization, but not direction, to honor and pay any unpaid Contractor Obligations.

64. The Debtors request authorization to maintain all Employee Benefit Obligations.

65. Together, the Debtors request authority that they be authorized, but not directed to (a) pay prepetition claims and honor obligations incurred or related to the Compensation Obligations, the Withholding Obligations, the Incentive Programs, PTO, Sick Leave, Holiday Pay, the Reimbursable Expense Obligations, the Employee Benefits Obligations, Workers' Compensation Claims, and all fees and costs incident to the foregoing (collectively, the "**Employee Obligations**"), and (b) maintain, continue, and honor, in the ordinary course of business, the Incentive Programs, PTO, Sick Leave, and Holiday Pay policies, postpetition Reimbursable Expense Obligations, the Employee Benefits Plans, and the Workers' Compensation Claims (collectively, the "**Employee Plans and Programs**").

66. To enable the Debtors to implement the relief requested, the Debtors also request that the Court authorize all applicable banks and financial institutions (collectively, the "**Banks**"), ADP and/or Paycom (together with the Banks, the "**Processors**"), to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors relating to the Employee Obligations and the Employee Plans and Programs, whether such checks were presented or electronic-payment requests were submitted prior to or after the Petition Date.

67. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

## D. The Utilities Motion

68.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) prohibiting Utility Providers (as defined below) from (a) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition, or (b) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (ii) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (iii) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

69.     In conjunction with its day-to-day operations, the Debtors receive traditional utility services from approximately two utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**") for, among other things, electricity, internet, telephone, and similar utility products and services (collectively, the "**Utility Services**").

70.     The Debtors paid an average of approximately $95,191.58 per month on account of all Utility Services during 2021. As "adequate assurance," the Debtors propose to segregate on their books and records, within 20 days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (*i.e.,* approximately $47,595.80), calculated based on the historical data for 2021 (the "**Adequate Assurance Deposit**") into one segregated bank account designated for the Adequate Assurance Deposit (the "**Adequate Assurance Deposit Account**") for the benefit of all Utility Providers.

71.     I believe that uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases. Should any Utility Provider alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' ability to reorganize through

chapter 11. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Providers without hindering the Debtors' ability to maintain operations. I am informed and believe that the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### E.     The Insurance Motion

72.     Pursuant to the Insurance Motion, the Debtors seek entry of an order: (i) authorizing, but not directing, the Debtors to continue and, to the extent necessary, renew prepetition insurance policies in the ordinary course of business and pay prepetition obligations in respect thereof, (ii) authorizing banks and other financial institutions at which the Debtors hold accounts (collectively, the "**Banks**") to honor and process check and electronic transfer requests related to the foregoing, (iii) preventing insurance companies from giving any notice of termination or otherwise modifying or cancelling any insurance policies without first obtaining relief from the automatic stay imposed by Bankruptcy Code section 362, and (iv) authorizing, but not directing, the Debtors to continue to honor premium financing and brokerage obligations.

73.     In the ordinary course of their business, the Debtors maintain approximately 25 insurance policies with various insurance providers (collectively, the "**Insurers**") that provide coverage for, among other things, the Debtors' general liability, director and officer liability, fiduciary liability, employment practices liability, workers compensation liability, automobile liability, professional liability, cyber liability, and property liability (each, an "**Insurance**

**Policy**" and collectively, the "**Insurance Policies**"), as summarized in <u>Exhibit B</u> to the Insurance Motion.

74.     The Debtors incur a total of approximately \$4.55 million in premiums on an annual basis under the terms of their existing Insurance Policies as well as other obligations, including the Broker Fees (as defined below) and other related fees and costs (collectively, the "**Insurance Obligations**"). In addition, the Debtors may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable.

75.     The Debtors seek authority to pay premiums under the Insurance Policies based on a fixed amount established and billed by each Insurance Provider. Depending on the particular Insurance Policy, premiums are primarily (a) prepaid in full at a policy's inception or renewal; (b) financed through a premium financing company; or (c) paid in installments to a broker over the term of the policy.

76.     Generally, these Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period. In the ordinary course of business, the Debtors renew annual coverages under many of their policies, including those related to general professional liability, flood coverage, and key man life coverage, and the Debtors pay the full amount of the premiums owed for such policies due at renewal. Accordingly, as of the Petition Date, the Debtors do not owe unpaid premium amounts on account of policies that require payment in full at the inception of the applicable policy period.

77.     Generally, the Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period. However, it is not always economically advantageous for the Debtors to pay the premiums on all of the Insurance Policies on a lump-sum basis. Accordingly, in the ordinary course of business, the Debtors finance the premiums on

77548653

certain policies pursuant to three premium financing agreements (each, a "**PFA**" and collectively, the "**PFAs**") with First Insurance Funding ("**First Insurance**"). The Debtors entered into the PFAs with **First Insurance** in order to finance insurance premiums for certain policies as detailed in Exhibit B to the Insurance Motion, including property liability, general and professional liability, executive risk liability, directors and officers, employment practices liability, commercial auto, and fiduciary liability. The Debtors have fully paid all installments on all of the PFAs. The Debtors have paid any down payments prior to the Petition Date, and have continued to pay the monthly installments as they become due.

78.     If the Debtors are unable to continue making payments on the remaining PFA, **First Insurance** may be permitted to terminate the PFA. The Debtors would then be required to obtain replacement insurance on an expedited basis and at significant cost to the estates. If the Debtors are required to obtain replacement insurance and to pay a lump-sum premium for such Insurance Policy in advance, this payment would likely be greater than what the Debtors currently pay. Even if **First Insurance** were not permitted to terminate the PFA, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

79.     In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by financing their insurance premiums, the Debtors believe it is in the best interest of their estates to receive Court approval to honor their obligations under the PFA and, as necessary, renew or enter into new such agreements.

80.     The Debtors use Alliance Insurance Group (the "**Broker**") to assist them with the procurement and negotiation of certain Insurance Policies. The Broker assists the Debtors in obtaining comprehensive insurance coverage for their operations, analyzing the market for

22

available coverage and negotiating policy terms, provisions, and premiums. The Broker also provides ongoing support through the policy periods. The Debtors pay the Broker any fees and commissions that are owed under the PFAs (the "**Broker Fees**"). As of the Petition Date, the Debtors do not believe that they owe any amounts to the Broker on account of fees, commissions, or any other prepetition obligations beyond the commission amounts already contained in the next PFA installment that will come due in the ordinary course of the Debtors' business. Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to the Broker to ensure uninterrupted coverage under their Insurance Policies.

81.     The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including but not limited to: (i) direct liability for the payment of claims that otherwise would have been payable by the Insurers; (ii) material costs and other losses that otherwise would have been reimbursed by the Insurers under the Insurance Policies; (iii) the loss of good standing certification in jurisdictions that require the Debtors to maintain certain levels of insurance coverage; (iv) the inability to obtain similar types of insurance coverage; and (v) higher costs for re-establishing lapsed policies or obtaining new insurance coverage. I believe that any or all of these consequences could cause serious harm to the Debtors' business. Granting the relief requested in the Insurance Motion will enhance the likelihood of the Debtors' successful rehabilitation or sale process.

77548653

**F.** **The Cash Management Motion**

82.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of existing bank accounts, checks, and business forms, (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the Northern District of Texas (the "**U.S. Trustee**") to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described herein, and (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices notwithstanding the provisions of Bankruptcy Code section 345(b).

83.     The Debtors manage, oversee, audit, and provide ancillary services to 28 subsidiaries that operate 21 SNFs and one assisted living facility. The Company collects Medicare, Medicaid, and private pay receivables. The Debtors manage and provide payroll, accounting, and financial reporting for the Company.

84.     The Debtors' cash management system includes (a) corporate-level bank accounts, (b) management-entity level bank accounts, and (c) facility-level bank accounts (the "**Cash Management System**") and is integral to the operation and administration of the Debtors' business. The Cash Management System allows the Debtors to monitor and control all cash receipts and disbursements, identify the cash requirements of the operation, and transfer cash as needed to respond to the cash requirements.

85.     The amount of funds that flow through the Cash Management System on a monthly basis fluctuates greatly depending on, among other things, new client deposits, census level, depositing of checks in transit, and Medicare, Medicaid, and private pay receivables.

86. Although the Cash Management System is complex, there are only four bank accounts at CIBC Bank USA ("**CIBC**"), in the name of Debtor Senior Care Centers, LLC, which are: (a) Non-HUD AP Funding Account; (b) Divested Concentration Account; (c) Divested AP Funding Account; and (d) CHOW Patient Refund Account; and one bank account at Bank of Texas, (together with CIBC, the "**Banks**"), in the name of Debtor Abri Health Services, LLC, which is the Employee Benefits Funding Account (collectively, the "**Debtor Bank Accounts**").

87. As part of the overall Cash Management System, the Debtors maintain two separate systems, one for HUD facilities and the other for non-HUD facilities. For the non-HUD system, there are several receivables accounts that collect cash for the Debtors' non-HUD facilities, which cash is then swept into the non-HUD concentration account. The cash is then transferred from the concentration account to a funding/payable account, where funds are then transferred to facility-level accounts payable accounts. A similar, but completely separate, system applies to the HUD facilities, but none of the HUD bank accounts are in the name of the Debtors.

88. In addition, there are approximately 100 bank accounts related to various divested skilled nursing facilities that collect cash related to the divested operations. The cash is then transferred to the new operator accounts or to bank accounts for the non-debtors.

89. As the foregoing summary reflects, the Debtors business is highly regulated and they maintain a complex Cash Management System but the vast majority of this system relates to non-debtor entities. The Cash Management System is specifically designed for administering the Debtors' businesses, and it cannot be altered without significant disruption to the Debtors' business operations and material distraction to the management.

90.     The Debtors, therefore, request that the Court authorize them to continue using the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System as the Debtors did prepetition including, without limitation, any prepetition cash management agreements, bank account terms and conditions, or treasury services agreements.

91.     The Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during these subchapter V Cases and their goal of maximizing value for the benefit of all parties in interest. I believe that requiring the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the majority of the Debtor Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**"). For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

92.     I respectfully submit that the Cash Management Motion should be approved.

## G.     The Ombudsman Waiver Motion

93.     Pursuant to the Ombudsman Waiver Motion, the Debtors seek entry of an order finding that the appointment of a patient care ombudsman pursuant to Bankruptcy Code section 333 is not necessary for the protection of patients under the facts and circumstances of this case, and that the requirement to appoint a patient care ombudsman pursuant to Bankruptcy Code section 33 is waived.

94.     As discussed above, the health care businesses of the Company are conducted entirely by the non-debtor providers that provide health care services to patients and are not part of this bankruptcy proceeding. I understand that these non-debtor providers are separately and independently licensed and certified, and the Debtors are not licensed to provide health care services nor are they certified to participate in the Medicare or Medicaid programs. I believe that the regulation of the non-debtor providers by various governmental authorities and programs will not be impacted by these Cases and will continue in the ordinary course. It is my belief that the Company's business will continue to operate as usual during the pendency of the Debtors' Cases through the continued operation of the Facilities by non-debtor providers, and appointment of a patient care ombudsman is not necessary for the protection of the patients at the Facilities

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of April 2021
Dallas, Texas

**Abri Health Services, LLC**
Debtors and Debtors in Possession

*/s/ Kevin O'Halloran*
Kevin O'Halloran
Chief Executive Officer

## **Exhibit A**

Organizational Chart



**Senior Care Centers, LLC**

Sole Member and 100% owner

**SCC Facilities**

(each a separate entity)
- Brownwood SCC LLC
- Community SCC LLC
- Crowley SCC LLC
- Green Oaks SCC LLC
- Harbor Lakes SCC LLC
- Hewitt SCC LLC
- Holland SCC LLC
- Mission SCC LLC
- Redoak SCC SCC LLC
- SCC Edinburg LLC
- Stallings Court SCC LLC
- Stonegate SCC LLC



