Liz Boydston (SBN 24053684)
Trinitee G. Green (SBN 24081320)
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
lboydston@polsinelli.com
sbarlow@polsinelli.com
tggreen@polsinelli.com

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
Stephen J. Astringer (Admitted *Pro Hac Vice*)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

COUNSEL TO THE DEBTORS AND
DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Abri Health Services, LLC, *et al.*,[1] | § | Case No. 21-30700 (SGJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER
(I) APPROVING SETTLEMENT AGREEMENT,
(II) AUTHORIZING THE DEBTORS TO CONSUMMATE THE SETTLEMENT,
EXECUTE TRANSACTION DOCUMENTS, AND PERFORM OBLIGATIONS OF
THE SETTLEMENT, AND (II) GRANTING RELATED RELIEF**

**AN EXPEDITED VIRTUAL HEARING WILL BE CONDUCTED ON THIS MATTER ON OR BEFORE AUGUST 30, 2021.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT BEFORE 11 P.M. CENTRAL TIME ON THURSDAY, AUGUST 26, 2021.**

**YOU MUST SERVE A COPY OF YOUR RESPONSE VIA ELECTRONIC MAIL TO LIZ BOYDSTON AT LBOYDSTON@POLSINELLI.COM AND RACHAEL SMILEY AT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Abri Health Services, LLC (3319) and Senior Care Centers, LLC (8550).

**RSMILEY@FBFK.LAW; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

The above-captioned debtors and debtors in possession hereby move (the "**Motion**") for entry of an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Proposed Order**"), pursuant to section 105 of title 11 of the United States Code (the "**Bankruptcy Code**") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) approving a compromise and release agreement (the "**Settlement Agreement**"), which is attached to the Proposed Order as <u>Exhibit 1</u>, by and among Abri Health Services, LLC ("**Abri**") and Senior Care Centers, LLC ("**SCC**" and together with Abri, the "**Debtors**"), Green Oaks SCC LLC, Brownwood SCC LLC, Crowley SCC LLC, Harbor Lakes SCC LLC, Stonegate SCC LLC, Hewitt SCC LLC, Mission SCC LLC, Stallings Court SCC LLC, Red Oak SCC LLC, Community SCC LLC, and Holland Lake SCC LLC, each a Texas limited liability company (together, the "**Non-Debtor Operator Entities**"), TXMS Real Estate Investments, Inc. ("**TXMS**"), LTC Properties, Inc., a Maryland corporation ("**LTC**"), the parent company of TXMS, Winnie-Stowell Hospital District, a governmental entity and political subdivision of the State of Texas organized pursuant to Tex. Const. Art. IX, §9 and Chapter 286 of the Health and Safety Code, as amended ("**Winnie-Stowell**"), and HMG Healthcare, LLC and its affiliates ("**HMG**" and collectively with all other parties to the Settlement Agreement, the "**Parties**"); (ii) authorizing the Debtors to consummate the settlement, execute the transaction documents, and perform obligations of the settlement; and (iii) granting related relief. In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). The Debtors consent to entry of a final order under Article III of the United States Constitution.

2. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I. General Background

3. On April 16, 2021 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief and electing treatment under subchapter V of chapter 11 of the Bankruptcy Code (the "**Subchapter V Cases**"). The Subchapter V Cases are jointly administered under Case No. 21-30700.

4. The factual background regarding the Debtors, including their business operations and the events leading to the filing of the Subchapter V Cases is set forth in the *Declaration of Kevin O'Halloran, Chief Executive Officer of Abri Health Services, LLC in Support of Subchapter V of Chapter 11 Petitions and First Day Pleadings* [Docket No. 10] (the "**First Day Declaration**"),which is incorporated herein by reference; however, TXMS disputes many of the contentions in the First Day Declaration.

5. The Debtors continue to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6. On April 21, 2021, the Office of the United States Trustee for the Northern District of Texas appointed a Subchapter V trustee in the Subchapter V Cases (the "**Subchapter V Trustee**").

## II. The 2018 Cases

7. On December 4, 2018, SCC and approximately 128 affiliates (the "**2018 Debtors**") filed petitions for relief under chapter 11 of the Bankruptcy Code commencing bankruptcy cases (the "**2018 Cases**"). The 2018 Cases were jointly administered under Case No. 18-33967.

8. On October 25, 2019, the 2018 Debtors filed the *Notice of Filing of Solicitation Version of Disclosure Statement for the Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 2094] (the "**Solicitation Notice**"). Attached to the Solicitation Notice as Exhibit A, was the solicitation version of the *Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (as may be further amended, modified, and/or supplemented, the "**Plan**"). On December 13, 2019, the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 2376] (the "**2018 Confirmation Order**"). On March 27, 2020 (the "**2018 Plan Effective Date**"), all conditions to the occurrence of the 2018 Plan Effective Date set forth in the Plan and 2018 Confirmation Order were satisfied or waived in accordance therewith, and the 2018 Plan Effective Date occurred. On March 30, 2020, the *Notice of (I) Entry of Findings of Fact, Conclusions of Law, and Order Confirming Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, (II) Occurrence of the Effective Date, and (III) Bar Date Notice for Rejection Damages Claims, Administrative Claims and Professional Fee Claims* [Docket No. 2659] (the "**2018 Effective Date Notice**") was filed.

## III. The TXMS Master Lease

9. SCC and TXMS are parties to the Second Amended and Restated Master Lease Agreement dated as of August 27, 2013, as amended (the "**TXMS Master Lease**"). During the 2018 Cases, the Debtors assumed the TXMS Master Lease. Pursuant to the 2018 Confirmation

Order, Abri was made a co-obligor and co-lessee on a joint and several basis under the TXMS Master Lease. *See* 2018 Confirmation Order ¶ 76(j). The TXMS Master Lease relates to 11 skilled nursing facilities (the "**TXMS Facilities**") located across Texas. SCC, through a series of subleases (collectively, the "**TXMS Subleases**"), leases the TXMS Facilities to the Non-Debtor Operating Entities.

10.     In a letter dated April 7, 2021, TXMS sent a termination notice to the Debtors for alleged breaches of the Master Lease. Pursuant to the termination notice, the Master Lease would be terminated on April 17, 2021.

11.     The Debtors filed the Subchapter V Cases on April 16, 2021.

## THE PROPOSED SETTLEMENT AGREEMENT

12.     The Parties have negotiated the Settlement Agreement, which is a global compromise and settlement that resolves various disputed issues and obviates the need to engage in costly and protracted litigation. The proposed Settlement Agreement is attached as Exhibit 1 to the proposed order submitted with the Motion.

13.     As of the Effective Date of the Settlement Agreement, subject to the approval of the Bankruptcy Court, the Settlement Agreement provides for among other things, the resolution of all the claims and disputes by and between, among others, TXMS and the Debtors, subject to the expressed terms thereto.

## RELIEF REQUESTED

14.     Through this Motion, the Debtors seek (a) approval of the Settlement Agreement, (b) authority to consummate the settlement, execute the transaction documents, and cause the Non-Debtor Operator Entities to enter into the Operations Transfer Agreements (each an "**OTA**" and together the "**OTAs**") and other transaction documents (the Settlement Agreement, OTAs, the Indemnity Claims Escrow Agreement, and all other necessary documents are collectively the

5

"**Transaction Documents**"), which, combined with the Settlement Agreement, constitute one, integrated, indivisible agreement between the Parties and not separate agreements governed by similar terms, and (c) related relief.

## BASIS FOR RELIEF

15.     Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The United States Supreme Court has recognized that compromises and settlements are "a normal part of the process of reorganization." *Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Accordingly, a Bankruptcy Court may, in its discretion, approve settlements in accordance with Bankruptcy Rule 9019(a). *CFB-5, Inc. v. Cunningham*, 371 B.R. 175, 181 (N.D. Tex. 2007). "Approval should only be given if the settlement is fair and equitable and in the best interest of the estate." *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007) (internal quotations omitted).

16.     In deciding whether the settlement of a controversy is "fair and equitable," the Court must make a well-informed decision, comparing the terms of the compromise with the likely rewards of litigation. *In re Cajun Elec.*, 119 F.3d at 355; *In re Heritage Org.*, 375 B.R. at 259. The factors to be reviewed by the Court in determining whether or not to approve a compromise are:

     a.    the probability of success in the litigation, with due consideration for the uncertainty in fact and law;

     b.    the complexity and likely duration of the litigation and any attendant expenses, inconvenience and delay; and

     c.    all other factors bearing on the wisdom of the compromise.

*In re Cajun Elec.*, 119 F.3d at 356; *In re Heritage Org.*, 375 B.R. at 259. The Court should also consider the best interest of the creditors, with proper deference to their reasonable views, and the

79389471.11

extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. *In re Cajun Elec.*, 119 F.3d at 356; *In re Heritage Org.*, 375 B.R. at 260.

17. It is unnecessary for the Court to conduct a mini-trial before approving a settlement. *In re Cajun Elec.*, 119 F.3d at 356; *In re Heritage Org.*, 375 B.R. at 260. The Court need only make itself aware of relevant facts and law so that it may make an informed and intelligent decision. *In re Cajun Elec.*, 119 F.3d at 356; *In re Heritage Org.*, 375 B.R. at 260. "The settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness." *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *aff'd sub nom. In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011).

18. Approval of the Settlement Agreement, which is a product of extensive, arms-length bargaining between the Parties, is fair and equitable and in the best interest of the Debtors' estates; and the relevant factors weigh in favor of approving the Settlement Agreement.

19. The Settlement Agreement is beneficial to the Debtors' estates because it resolves a major dispute in these Subchapter V Cases. Additionally, the Settlement Agreement will avoid the cost and distraction of litigation over the relevant questions of law and fact. Given the limited resources of the Debtors' estates, litigation over these issues will not benefit the Debtors' estates or their creditors. Thus, the Settlement Agreement provides a fair resolution in light of the legal and economic risks to the Debtors. Based on the foregoing, the Debtors submit that the Settlement Agreement is in the best interests of the Debtors' estates and should be approved.

## **WAIVER OF 14-DAY STAY**

20. Pursuant to Bankruptcy Rule 6004(h), the Debtors seek a waiver of any stay of the effectiveness of an order granting this Motion, to the extent that it applies to the relief requested in this Motion. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or

79389471.11

lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

21.     The Debtors request that any order approving this Motion be effective immediately, thereby waiving any applicable stays imposed by the Bankruptcy Rules. These waivers or eliminations of any applicable stays are necessary for the transactions contemplated by the Settlement Agreement to close as expeditiously as possible. The Debtors respectfully submit that it is in the best interest of their estates to consummate the Settlement Agreement (including the closing of the transactions contemplated by the Settlement Agreement) as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors request that the Court eliminate any applicable stays imposed by the Bankruptcy Rules.

## NOTICE

22.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) the Office of the Attorney General of Texas; (c) the Debtors' 20 largest unsecured creditors on a consolidated basis; (d) the Internal Revenue Service; (e) counsel to TXMS; (f) counsel to Winnie-Stowell; (g) counsel to HMG; (h) the Subchapter V Trustee; (i) the attached service list; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.

23.     The Debtors respectfully submit that such notice is sufficient and that no further notice of this Motion is required.

## NO PRIOR REQUEST

24.     No previous request for the relief sought herein has been made to this Court or any other court.

79389471.11

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially similar to the form attached as <u>Exhibit A</u>, granting (i) the relief requested herein and (ii) such other and further relief as it deems just and proper.

Dated: August 25, 2021
Dallas, Texas

Respectfully submitted,

**POLSINELLI PC**

/s/    *Liz Boydston*
Liz Boydston (SBN 24053684)
Trinitee G. Green (SBN 24081320)
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
lboydston@polsinelli.com
tggreen@polsinelli.com

-and-

Jeremy R. Johnson (Admitted *Pro Hac Vice*)
Stephen J. Astringer (Admitted *Pro Hac Vice*)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

*Counsel to the Debtors and Debtors in Possession*

79389471.11

In re Abri Health Services, LLC, et al.
Case No. 21-30700 (Jointly Administered)

Service List

| **Debtors:**<br>Abri Health Services, LLC<br>Senior Care Centers, LLC<br>600 North Pearl St., #1050<br>Dallas, TX 75201<br>**Via U.S. Mail** | **Office of the U.S. Trustee**<br>Attn: Meredyth A. Kippes<br>1100 Commerce St., Rm. 976<br>Dallas, TX 75242<br>**ECF:** meredyth.a.kippes@ust.doj.gov | **Subchapter V Trustee**<br>The Law Office of Mark A. Weisbart<br>Mark A. Weisbart<br>12770 Coit Rd., #541<br>Dallas, TX 75251<br>**ECF:** mark@weisbartlaw.net |
|---|---|---|
| **GOVERNMENTAL AGENCIES** | | |
| Internal Revenue Service<br>Special Procedures-Insolvency<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346<br>**Via U.S. Mail** | **Texas Health & Human Services Commission**<br>c/o Jason B. Binford<br>Layla D. Milligan<br>**Assistant Attorneys General**<br>Bankruptcy & Collections Division<br>P.O. Box 12548<br>Austin, TX 78711-2548<br>**ECF:** jason.binford@oag.texas.gov<br>layla.milligan@oag.texas.gov | Counsel for the US Government<br>Leah.V.Lerman@usdoj.gov |
| **TOP 20 CREDITORS** | | |
| Birch Communications<br>Attn: Nicole Scarberry-McKee<br>1301 Chestnut<br>Emporia, KS 66801<br>**Via U.S. Mail** | Centurylink<br>Attn: Legal-Bankruptcy Dept.<br>1025 El Dorado Blvd.<br>Broomfield, CO 80021<br>**Via U.S. Mail** | Cogent Communications, Inc.<br>P.O. Box 791087<br>Baltimore, MD 21217-1087<br>**Via U.S. Mail** |
| Kyocera Document Solutions, Southwest<br>2825 Story Rd. West<br>Irving, TX 75038<br>**Via U.S. Mail** | TXMS Real Estate Investments, Inc.<br>2829 Townsgate Rd., #350<br>Westlake Village, CA 91361<br>**Via U.S. Mail** | |
| **NOTICES OF APPEARANCE** | | |
| **Annaly Healthcare Investments; CHI Javelin Landlords**<br>c/o Joseph J. Wielebinski<br>Jason A. Enright<br>Winstead PC<br>500 Winstead Bldg.<br>2827 N. Harwood St.<br>Dallas, TX 75201<br>**ECF:** jwielebinski@winstead.com<br>jenright@winstead.com | **Bell County; Coryell County; Denton County; Erath County; Hays County; Williamson County;**<br>c/o Tara LeDay<br>McCreary, Veselka, Bragg & Allen, P.C.<br>P.O. Box 1269<br>Round Rock, TX 78680-1269<br>**Email:** tleday@mvbalaw.com | **Bexar County**<br>c/o Don Stecker<br>Linebarger Goggan Blair & Sampson, LLP<br>112 E. Pecan St., #2200<br>San Antonio, TX 78205<br>**ECF:**<br>sanantonio.bankruptcy@publicans.com |

| | | |
|---|---|---|
| **Dallas County**<br>c/o Laurie A. Spindler<br>Linebarger Goggan Blair & Sampson, LLP<br>2777 N. Stemmons Frwy., #1000<br>Dallas, TX 75207<br>**ECF:** dallas.bankruptcy@publicans.com | **HC Hill Country Associates, Ltd; H-C Associates, Ltd.; HC-RW Associates Ltd.; Hidalgo Healthcare Realty, LLC; J-S Fredericksburg Realty, LP**<br>c/o Kevin M. Lippman<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard St., #3800<br>Dallas, TX 75201-6659<br>**ECF:** klippman@munsch.com | **HMG Healthcare**<br>c/o Underwood Law Firm<br>Roger Cox<br>Gavin Gadberry<br>500 S. Taylor, #1200<br>Amarillo, TX 79101<br>**Email:** roger.cox@uwlaw.com<br>Gavin.Gadberry@uwlaw.com |
| **Midland County**<br>c/o Laura J. Monroe<br>Perdue, Brandon, Fielder, Collins & Mott, L.L.P.<br>P.O. Box 817<br>Lubbock, TX 79408.<br>**ECF:** lmbkr@pbfcm.com | **Nacogdoches County**<br>c/o Tad Beall<br>Perdue, Brandon, Fielder, Collins & Mott, LLP<br>P.O. Box 2007<br>Tyler, TX 75710-2007<br>**ECF:** tbeall@pbfcm.com<br>tylbkc@pbfcm.com | **Pota JV, LLC**<br>c/o Heather J. Panko<br>Peter C. D'Apice<br>Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation<br>2323 Bryan St., #2200<br>Dallas, TX 78201<br>**ECF:** panko@sbep-law.com<br>dapice@sbep-law.com |
| **Synchrony Bank**<br>c/o Valerie Smith<br>PRA Receivables Management, LLC<br>P.O. Box 41021<br>Norfolk, VA 23541<br>**Email:** Claims_RMSC@PRAGroup.com | **Texas Comptroller of Public Accounts**<br>Kimberly A. Walsh<br>Assistant Attorney General<br>Bankruptcy & Collection Division MC 008<br>P.O. Box 12548<br>Austin, TX 78711-2548<br>**ECF:** Kimberly.walsh@oag.texas.gov | **Trident Holding Company LLC**<br>c/o Frank A. Oswald<br>Minta Nester<br>Togut, Segal & Segal LLP<br>One Penn Plaza, #3335<br>New York, NY 10119<br>**Email:** frankoswald@tematogut.com<br>mnester@teamtogut.com |
| **TXMS Real Estate Investments, Inc.**<br>c/o Leighton Aiken<br>Dana M. Campbell<br>Rachael L. Smiley<br>Ferguson Braswell Fraser Kubasta PC<br>2500 Dallas Pkwy., #600<br>Plano, TX 75093<br>**ECF:** laiken@fbfk.law<br>dcampbell@fbfk.law<br>rsmiley@fbfk.law | **United States of America**<br>c/o Leah V. Lerman<br>U.S. Dept. of Justice, Civil Division<br>1100 L St., N.W., Rm. 7002<br>Washington, DC 20005<br>P.O. Box 875<br>Ben Franklin Station<br>Washington, DC 20044-0875<br>**ECF:** Leah.V.Lerman@usdoj.gov | **Winnie-Stowell Hospital District**<br>c/o Clay M. Taylor<br>William R. Howell, Jr.<br>Bonds Ellis Eppich Schafer Jones LLP<br>420 Throckmorton St., #1000<br>Fort Worth, TX 76102<br>**ECF:** clay.taylor@bondsellis.com<br>**Email:** William.howell@bondsellis.com |

## ADDITIONAL PARTIES

| | | |
|---|---|---|
| **Counsel for Allen Boerner, John J. Heller, M. Scott Rickard, and Michael Brandley**<br>Via Email: pminiter@lynnllp.com<br>cakin@lynnllp.com | **Counsel for Andrew Kerr**<br>Via Email: amore@ccsb.com<br>bcollins@ccsb.com<br>msutherland@ccsb.com<br>darmijo@ccsb.com | **Counsel for Alan D. Halperin, as Unsecured Creditor Trustee**<br>Via email: elrodj@gtlaw.com |

79506199.1

| | | |
|---|---|---|
| **Counsel for Granite Landlords**<br>Via email:<br>Vickie.driver@crowedunlevy.com<br>Seth.sloan@crowedunlevy.com<br>Crissie.stephenson@crowedunlevy.com<br>Elisa.weaver@crowedunlevy.com<br>ecf@crowedunlevy.com | | |

### INSURANCE COMPANIES

| | | |
|---|---|---|
| ACE American Insurance Company<br>1133 Avenue of the Americas, 32nd Fl.<br>New York, NY 10036<br>**Via U.S. Mail** | Allied World Assurance Co. (US), Inc.<br>901 5th Ave., #2300<br>Seattle, WA 98164<br>**Via U.S. Mail** | Allied World Specialty Insurance Company<br>1690 New Britain Ave., #101<br>Farmington, CT 06032<br>**Via U.S. Mail** |
| American Bankers Insurance<br>d/b/a Assurant<br>P.O. Box 8695<br>Kalispell, MT 59904<br>**Via U.S. Mail** | American Empire Surplus Lines<br>Insurance Company<br>301 E. 4th St.<br>Cincinnati, OH 45202<br>**Via U.S. Mail** | Arch Specialty Insurance Company<br>2345 Grand Blvd., #900<br>Kansas City, MO 64108<br>**Via U.S. Mail** |
| Ategrity Specialy Insurance Company<br>15990 Greenway-Hayden Loop,<br>#D-160<br>Scottsdale, AZ 85260<br>**Via U.S. Mail** | Ategrity Specialty Insurance Company<br>14000 N. Pima Rd., #200<br>Scottsdale, AZ 85260<br>**Via U.S. Mail** | AXIS Surplus Insurance Company<br>111 S. Wacker Dr., #3500<br>Chicago, IL 60606<br>**Via U.S. Mail** |
| AXIS U.S. Insurance<br>P.O. Box 932745<br>Atlanta, GA 31193<br>**Via U.S. Mail** | Berkley Insurance Company<br>20 Commerce Dr., 2nd Fl.<br>New Jersey, NJ 07016<br>**Via U.S. Mail** | Berkshire Hathaway Homestate Insurance<br>Company<br>1314 Douglas St.<br>Omaha, NE 68102<br>**Via U.S. Mail** |
| Crum & Forster Specialty Insurance<br>P.O. Box 23605<br>Portland, OR 97281<br>**Via U.S. Mail** | Darwin Select Insurance Company<br>1960 E. Grand Ave., #1080<br>El Segundo, CA 90245<br>**Via U.S. Mail** | Endurance American Specialty Insurance<br>Company<br>901 5th Ave., #2300<br>Seattle, WA 98164<br>**Via U.S. Mail** |
| Evanston Insurance Company<br>201 California St., #1450<br>San Francisco, CA 94111<br>**Via U.S. Mail** | Evanston Insurance Company<br>20 Commerce Dr., 2nd Fl.<br>New Jersey, NJ 07016<br>**Via U.S. Mail** | Evanston Insurance Company<br>10275 W. Higgins Rd., #750<br>Rosemont, IL 60018<br>**Via U.S. Mail** |
| Evanston Insurance Company<br>10 Parkway North<br>Deerfield, IL 60015<br>**Via U.S. Mail** | Everest Indemnity Insurance Company<br>c/o Mt. McKinley Managers, LLC<br>28 State St., 36th Fl.<br>Boston, MA 02109<br>**Via U.S. Mail** | Everest Indemnity Insurance Company<br>477 Martinsville Rd.<br>P.O. Box 830<br>Liberty Corner, NJ 07938<br>**Via U.S. Mail** |
| Federal Insurance Company<br>555 S. Flower St., 3rd Fl.<br>Los Angeles, CA 90071<br>**Via U.S. Mail** | First Specialty Insurance Corporation<br>1200 Main St., #800<br>Kansas City, MO 64105<br>**Via U.S. Mail** | General Star Indemnity Company<br>120 Long Ridge Rd.<br>Stamford, CT 06902<br>**Via U.S. Mail** |

3

| | | |
|---|---|---|
| Great American Alliance Insurance Company<br>P.O. Box 5425<br>Cincinnati, OH 45201<br>**Via U.S. Mail** | Hallmark Specialty Insurance Company<br>5420 LBJ Frwy., #1100<br>Dallas, TX 75240<br>**Via U.S. Mail** | Hartford Insurance Company of the Midwest<br>P.O. Box 913385<br>Denver, CO 80291<br>**Via U.S. Mail** |
| Hartford Steam Boiler<br>P.O. Box 61509<br>King of Prussia, PA 19406<br>**Via U.S. Mail** | Homeland Insurance Company of New York<br>902 5th Ave., #2300<br>Seattle, WA 98164<br>**Via U.S. Mail** | James River Insurance Company<br>6641 W. Broad St., #300<br>Richmond, VA 23230<br>**Via U.S. Mail** |
| Illinois Union Insurance Company<br>525 W. Monroe St., #400<br>Chicago, IL 60661<br>**Via U.S. Mail** | Ironshore Specialty Insurance Company<br>20 Commerce Dr., 2nd Fl.<br>New Jersey, NJ 07016<br>**Via U.S. Mail** | Ironshore Specialty Insurance Company<br>901 5th Ave., #2300<br>Seattle, WA 98164<br>**Via U.S. Mail** |
| Ironshore Specialty Insurance Company<br>1960 E. Grand Ave., #1080<br>El Segundo, CA 90245<br>**Via U.S. Mail** | Landmark American Insurance Company<br>945 E. Paces Ferry Rd., #1800<br>Atlanta, GA 30326<br>**Via U.S. Mail** | Louisiana Workers Compensation Corporation<br>P.O. Box 91942<br>Dallas, TX 75391<br>**Via U.S. Mail** |
| National Fire & Marine Insurance Company<br>615 Second Ave., #640<br>Seattle, WA 98104<br>**Via U.S. Mail** | National Fire & Marine Insurance<br>75 Federal St., #1250<br>Boston, MA 02110<br>**Via U.S. Mail** | National Fire & Marine Insurance<br>5814 Reed Rd.<br>Fort Wayne, IN 46835<br>**Via U.S. Mail** |
| North American Capacity Insurance Company<br>1200 Main St., #800<br>Kansas City, MO 64105<br>**Via U.S. Mail** | North American Specialty Insurance Company<br>1200 Main St., #800<br>Kansas City, MO 64105<br>**Via U.S. Mail** | Philadelphia Indemnity Insurance Company<br>P.O. Box 2057<br>Kalispell, MY 59903<br>**Via U.S. Mail** |
| Philadelphia Indemnity Insurance Company<br>One Bala Plaza, #100<br>Bala Cynwyd, PA 19004<br>**Via U.S. Mail** | RSUI Group, Inc.<br>901 5th Ave., #2300<br>Seattle, WA 98164<br>**Via U.S. Mail** | Sompo International<br>725 S. Figueroa St., #2100<br>Los Angeles, CA 90017<br>**Via U.S. Mail** |
| Underwriters at Lloyd's London<br>615 Second Ave., #640<br>Seattle, WA 98104<br>**Via U.S. Mail** | Underwriters at Lloyd's London<br>181 N. Stetson Ave., #$600<br>Chicago, IL 60601<br>**Via U.S. Mail** | Validus Specialty Underwriting Services, Inc.<br>4 World Trade Center<br>150 Greenwich St., 47th Fl.<br>New York, NY 10007<br>**Via U.S. Mail** |
| Westchester Surplus Lines Insurance Company<br>901 5th Ave., #2300<br>Seattle, WA 98164<br>**Via U.S. Mail** | Western Surplus Lines Insurance Company<br>500 Colonial Center Pkwy., #200<br>Roswell, GA 30076<br>**Via U.S. Mail** | Zurich Services Corporation<br>1299 Zurich Way<br>Schaumburg, IL 60196<br>**Via U.S. Mail** |

79506199.1

## **EXHIBIT A**

Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Abri Health Services, LLC, *et al.*,[1] | § | Case No. 21-30700 (SGJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**ORDER (I) APPROVING SETTLEMENT AGREEMENT,**
**(II) AUTHORIZING THE DEBTORS TO CONSUMMATE THE SETTLEMENT,**
**EXECUTE TRANSACTION DOCUMENTS, AND PERFORM OBLIGATIONS OF THE**
**SETTLEMENT, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the Debtors for entry of an order (this "**Order**")

(i) approving a compromise and release agreement (the "**Settlement Agreement**") by and among

Debtors Abri Health Services, LLC ("**Abri**") a Senior Care Centers, LLC ("**SCC**"), Green Oaks

SCC LLC, Brownwood SCC LLC, Crowley SCC LLC, Harbor Lakes SCC LLC, Stonegate SCC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Abri Health Services, LLC (3319) and Senior Care Centers, LLC (8550).

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

LLC, Hewitt SCC LLC, Mission SCC LLC, Stallings Court SCC LLC, Red Oak SCC LLC, Community SCC LLC, and Holland Lake SCC LLC, each a Texas limited liability company (together, the "**Non-Debtor Operator Entities**"), TXMS Real Estate Investments, Inc. ("**TXMS**"), LTC Properties, Inc., a Maryland corporation ("**LTC**"), the parent company of TXMS, Winnie-Stowell Hospital District, a governmental entity and political subdivision of the State of Texas organized pursuant to Tex. Const. Art. IX, §9 and Chapter 286 of the Health and Safety Code, as amended ("**Winnie-Stowell**"), and HMG Healthcare, LLC and its affiliates ("**HMG**") (collectively, the "**Parties**") and (b) authorizing the Debtors to consummate the settlement, execute the transaction documents, and perform obligations of the settlement; and the Court having reviewed the Motion and the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. 157 and §§ 1334(b); and the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that the Debtors consent to entry of a final order under Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefore,

**IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      All objections to the relief requested in the Motion are overruled, were withdrawn, or were resolved by the express modifications agreed to herein.

2

3.       The Settlement Agreement (a true and correct copy of which is attached hereto as <u>Exhibit 1</u>) is hereby approved, and all terms of the Settlement Agreement and Transaction Documents are hereby incorporated in this Order, as if set forth herein verbatim, and are hereby approved.

4.       Notwithstanding anything in the Settlement Agreement, the Transaction Documents, or this Order, nothing shall affect or impair (a) any liability or obligation owed by the Debtors or Non-Debtor Operator Entities to the United States of America, including, without limitation, the U.S. Small Business Administration, the U.S. Social Security Administration, the U.S. Department of Veterans Affairs, the U.S. Department of the Treasury, the U.S. Department of Health and Human Services, and any and all component agencies, including without limitation, the Centers for Medicare & Medicaid Services and the Health Resources and Services Administration; (b) the United States of America's ability or right to pursue claims, collect debts, or enforce police powers or regulatory authority; (c) the United States of America's rights and defenses of recoupment and setoff; and (d) the change of ownership process pursuant to Medicare statutes, regulations, rules, policies and procedures, including, without limitation, the assumption of any and all Medicare liabilities pursuant to assignment of Medicare provider agreements.

5.       Subject to paragraph 6 herein, notwithstanding anything in the Settlement Agreement, the Operations Transfer Agreements, or this Order, nothing shall affect or impair any liability or obligation owed by the Debtors or Non-Debtor Operator Entities to the State of Texas, including, without limitation, the Health and Human Services Commission. Further, nothing in the Settlement Agreement, the Operations Transfer Agreements, or this Order authorizes the transfer or assignment of any governmental license, permit, registration, authorization, or approval, or the

discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.

6.      Winnie-Stowell and the Non-Debtor Operator Entities shall submit by August 31, 2021 a change of ownership application notifying Texas Health and Human Services and any other required regulatory agency of a proposed transfer of ownership of the operations of the TXMS Facilities from the Non-Debtor Operator Entities to Winnie-Stowell; Texas Health and Human Services shall not issue the vendor hold related to any change of ownership process as described herein until the Effective Date of the Settlement; and further provided that the vendor hold related to any change of ownership process shall only apply to Medicaid funds and shall not otherwise affect, implicate, apply to, or otherwise impact Medicare funds.

7.      No release or indemnification shall be granted in contravention of *Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.),* 584 F.3d 229 (5th Cir. 2009) or Bankruptcy Code section 524(e).

8.      The Debtors are ordered to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers, including the Settlement Agreement, the Operations Transfer Agreements (each an "**OTA**" and together the "**OTAs**"), and the Indemnity Claims Escrow Agreement, and to take any and all actions reasonably necessary or appropriate to consummate the settlement approved herein and to perform any and all obligations contemplated hereunder.  The Debtors shall cooperate and shall cause the Non-Debtor Operator Entities to cooperate in the transfer of operations of the TXMS Facilities as provided under the terms of the OTAs.

9.      Each of the Non-Debtor Operator Entities, TXMS, Winnie-Stowell, and HMG is authorized to and may execute, deliver, implement, and fully perform any and all obligations,

instruments, documents, and papers, including the Settlement Agreement, OTAs, and the Indemnity Claims Escrow Agreement and to take any and all actions reasonably necessary or appropriate to consummate the settlement approved herein and to perform any and all obligations contemplated hereunder.

10. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

11. The Debtors are authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Order.

12. To the extent there are inconsistencies between the Transaction Documents and this Order, this Order shall control with respect to paragraphs 4, 5, and 6. Regarding all other paragraphs, the parties shall present any alleged inconsistencies to this Court for adjudication.

13. This Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, or enforcement of this Order, consistent with the Settlement Agreement, OTAs and the Indemnity Claims Escrow Agreement.

### # # # End of Order # # #

79389471.11

Order submitted by:

**POLSINELLI PC**

/s/ _Liz Boydston_
Liz Boydston (SBN 24053684)
Trinitee G. Green (SBN 24081320)
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
lboydston@polsinelli.com
sbarlow@polsinelli.com
tggreen@polsinelli.com

-and-

Jeremy R. Johnson (Admitted _Pro Hac Vice_)
Stephen J. Astringer (Admitted _Pro Hac Vice_)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
sastringer@polsinelli.com

_Counsel to the Debtors and Debtors in
Possession_

# **EXHIBIT 1**

Settlement Agreement

## COMPROMISE AND RELEASE AGREEMENT

This Compromise and Release Agreement (the "Agreement") is made and entered into as of this 24th day of August, 2021 (the "Execution Date"), by and among TXMS Real Estate Investments, Inc., a Delaware corporation ("Lessor"), Senior Care Centers, LLC ("Senior Care Centers") and ABRI Health Services, LLC ("Abri"), each a Delaware limited liability company, (individually and collectively, "Lessee") Green Oaks SCC LLC, Brownwood SCC LLC, Crowley SCC LLC, Harbor Lakes SCC LLC, Stonegate SCC LLC, Hewitt SCC LLC, Mission SCC LLC, Stallings Court SCC LLC, Red Oak SCC LLC, Community SCC LLC, and Holland Lake SCC LLC, each a Texas limited liability company (each, an "Operator" and collectively, "Operators"), Winnie-Stowell Hospital District, a governmental entity and political subdivision of the State of Texas organized pursuant to Tex. Const. Art. IX, §9 and Chapter 286 of the Health and Safety Code, as amended ("New Operator") and HMG Healthcare, LLC and its affiliates ("HMG"). New Operator and HMG are executing this Agreement solely with respect to Paragraphs 3, 4, 7, 9, 10 and 13-27. LTC Properties, Inc., a Maryland corporation ("LTC"), the parent company of Lessor, is executing this Agreement solely with respect to Paragraphs 3, 4, 6, 7, 10 and 13-27.

## R E C I T A L S:

A.    Lessor and Lessee are parties to that certain Second Amended and Restated Master Lease Agreement, effective as of August 27, 2013, as amended by that certain First Amendment to Second Amended and Restated Master Lease Agreement, dated as of July 11, 2014, as amended by that certain Second Amendment to Second Amended and Restated Master Lease Agreement, dated as of November 12, 2015, and as amended by that certain Third Amendment to Second Amended and Restated Master Lease Agreement, dated as of March 27, 2020 (collectively, the "Lease") relating to the skilled nursing facilities listed on Schedule 1 hereto (individually, a "Facility," and collectively, the "Facilities").

B.    Lessee, as sublessor, and Operators, as sublessees, are parties to eleven (11) written subleases (the "Subleases") relating to the Facilities.

C.    On April 16, 2021 ("Petition Date"), each Lessee filed a voluntary petition for relief under Title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Code for the Northern District of Texas (the "Bankruptcy Court"). The bankruptcy cases ("Bankruptcy Cases") are being jointly administered under Case No. 21-30700 (sgj).

D.    New Operator and each Operator desire to enter into an Operations Transfer Agreements (each an "OTA" and together the "OTAs"), a form of which is set forth on Exhibit A and incorporated herein by reference for all purposes.

E.    Lessor, Lessee, New Operator, and HMG desire to enter into that certain Indemnity Claims Escrow Agreement, dates as of the Effective Date ("Escrow Agreement"), the form of which is attached hereto as Exhibit B and incorporated herein by reference for all purposes.

F.    The parties to this Agreement, acting by and through their duly authorized representative, and pursuant to the approval of the Bankruptcy Court, desire and agree to fully and

finally compromise all claims, actions, causes of actions and matters in dispute, related to or arising out of the Lease and Subleases, in order to avoid any future uncertainty, inconvenience, and expense of litigation.

NOW, THEREFORE, for and in consideration of the mutual promises and undertakings contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed by each of the parties hereto, the parties hereby agree as follows:

1.      The parties acknowledge and agree that the recitals set forth above are incorporated herein and are true and correct.

2.      Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Lease or OTAs, as applicable,

3.      This Agreement is expressly conditioned on entry of an order (the "Order") of the Bankruptcy Court approving the terms of this Agreement and the Transaction Documents (as defined herein), pursuant to one or more motions (together, the "Motion") filed by Lessee pursuant to Bankruptcy Rule 9019, the terms of which Motion are pre-approved by Lessor and New Operator. As used herein, the effective date ("Effective Date") of this Agreement shall be the Transfer Date (as defined therein) of the OTAs (which Transfer Date shall be the same for all OTAs).

4.      The Agreement, the OTAs and the Escrow Agreement (together, the "Transaction Documents") constitute one, integrated, indivisible agreement between the parties and not separate agreements governed by similar terms.  The Transaction Documents have been negotiated and agreed to as a single, composite, inseparable transaction and would have been substantially different had separate or divisible agreements been intended. A breach, default or the failure to perform by any Operator or Lessee under the terms of any Transaction Document shall be deemed a breach by Lessee and Operators under the terms of this Agreement, and a breach, default or the failure to perform by any Operator or Lessee under the terms of this Agreement shall be deemed a breach by Lessee and Operators under the terms of each of the other Transaction Documents. The sole remedy of LTC, Lessor, HMG or New Operator for a breach of the terms of the Transaction Documents by Lessee (including Abri and Senior Care Centers) or any Operator is to make a claim against the Indemnification Escrow (as defined herein) provided that Lessor and New Operator, as applicable, shall not be limited to the Indemnification Escrow as its sole remedy (a) with respect to claims of New Operator for damages that arise from one or more Operators breaching the obligation under Section 4.8 of the OTAs; (b) with respect to claims of New Operator for damages related to any recoupment of MAP Liability (as defined below) from New Operator in excess of Three Million Seven Hundred Thousand Dollars ($3,700,000) or (c) with respect to claims of Lessor for damages in the event that Lessee or any Operator breaches their obligations under Paragraph 11(b) of this Agreement.

5.      Operators and New Operator shall take all reasonable steps necessary to submit, by August 31, 2021, change of ownership applications notifying the Texas Health and Human Services Commission and any other required regulatory agency of a proposed transfer of ownership of the operations of the Facilities from the Operators to the New Operator.

6. On the Effective Date, Lessor or LTC shall pay to Operators the sum of Three Million Two Hundred Fifty Thousand and No/100 Dollars ($3,250,000.00) pursuant to wire instructions provided by Operators.

7. On the Effective Date, the parties hereto shall execute the Escrow Agreement (Exhibit B hereto). As provided in the Escrow Agreement, on the Effective Date, Lessor or LTC shall deposit $500,000 (the "Indemnification Escrow") with an escrow agent mutually agreeable to the parties, which funds shall be held in escrow for twenty four (24) months from the Effective Date (the "Escrow Period") pursuant to the terms the Escrow Agreement. Except as provided in Paragraph 4 of this Agreement, the Indemnification Escrow shall be the sole source of any recovery for a breach of the terms of the Transaction Documents. Any funds remaining upon the termination of the Escrow Period shall be distributed to Lessor and Lessee in accordance with the terms of the Escrow Agreement.

8. Lessor or New Operator shall be responsible for payment of all ad valorem real property taxes in respect of the Facilities for the 2021 tax year and thereafter. Lessor shall retain all rights, title, and interests in, to, and under any impounds, reserves and deposits held by Lessor under the terms of the Lease, which impounds, reserves and deposits may be applied to any outstanding obligations of Lessee under the Lease (including the payment of such ad valorem real property taxes) in such order as Lessor may elect. Lessee and Operators, as applicable, shall be responsible for payment of all franchise and other taxes payable with respect to Lessee and Operators, respectively.

9. The Medicare accounts receivable of the Operators for services rendered by Operators prior to the Effective Date shall be recouped in the normal course in order to repay outstanding Medicare COVID-19 Accelerated and Advance Payments liability ("MAP Liability") pursuant to the terms of CMS's COVID-19 Accelerated and Advance Payments Program, the Coronavirus Aid, Relief, and Economic Security (CARES) Act (P.L. 116-136) and the Continuing Appropriations Act, 2021 and Other Extensions Act (P.L. 116-159), regardless of the date when the Medicare accounts receivable are actually recouped, which recoupment shall continue to be the responsibility of Operators and Affiliates of Operators. Any recoupments up to $3.7 million ($3,700,000.00) from the accounts receivable of the New Operator for services rendered by New Operator after the Effective Date related to any remaining MAP Liability shall be the responsibility of New Operator and not Operators.

10. (a) Lessee agrees that, on the Effective Date, all tangible personal property and furniture, fixtures and equipment that is owned by any of Lessor, Lessee or Operators and that is used by Operators or Lessee in the operation of the Facilities as of July 15, 2021 and located at a Facility as of July 15, 2021 (including computers, computer equipment and hardware, office equipment, parts, supplies and all other tangible personal property), shall be, as applicable, transferred under the OTAs or returned to Lessor, and shall be free and clear of all liens, encumbrances and security interests, and (b)(i) Lessee represents and warrants that, to Lessee's knowledge, all tangible personal property and furniture, fixtures and equipment that is leased (or rented) by any of Lessee or any Operator and that is currently used by Lessee or any Operator in the operation of each Facility is listed on Schedule B or Schedule C to the Bill of Sale (as defined in OTA for each Facility), (ii) Lessee represents and warrants that, to Lessee's knowledge, there are no defaults or breaches by Lessee or any Operator under any lease (or rental agreement) for

the leased (or rented) assets listed on Schedule B to each such Bill of Sale, and (iii) Lessee agrees that all payments and amounts owed by Lessee or any Operator under all such leases (or rental agreements) shall be paid current by Lessee or Operators as of the Effective Date. The parties acknowledge and agree that any lien, encumbrance or security interest of Lessor or LTC or any of their respective affiliates against the property of Senior Care Centers, Abri or the Operators shall be and hereby are terminated and extinguished as of the Effective Date and any such property transferred, returned or delivered by Senior Care Centers, Abri or Operators pursuant to the terms of this Agreement or the OTAs shall be free and clear of such liens, encumbrances or security interests. Upon the occurrence of the Effective Date, Senior Care Centers, Abri and/or Operators are hereby authorized by LTC, Lessor and their respective affiliates to file any UCC-3 termination statements necessary to terminate any UCC-1 financing statement previously filed by LTC, Lessor or their respective affiliates against such property of Senior Care Centers, Abri or Operators.

11.     (a) The parties agree that the Lease and Subleases shall be deemed terminated as to each Facility upon the Effective Date; and (b) Notwithstanding such termination, Lessee and Operators shall (i) reasonably cooperate with Lessor to file and prosecute claims with Lessee's and Operators' property, casualty and business interruption insurers with respect to any property damage or casualty to any Facility that occurred prior to the Effective Date, (ii) assign such claims to Lessor (other than claims for proceeds of business interruption insurance for periods prior to the Transfer Date), and (iii) cause the proceeds paid in connection with such claims (other than claims for proceeds of business interruption insurance for periods prior to the Transfer Date) to be paid (or transferred) to Lessor, provided that Lessor pays or funds to Lessee any applicable deductible amount required for such claims.

12.     Within three (3) Business Days after the Effective Date, (a) Lessor and Lessee shall each dismiss with prejudice their respective claims in a joint pleading in that certain adversary proceeding styled *Texas Real Estate Investments, Inc. v. Senior Care Centers, LLC, et. al*, Adversary No. 20-3073, pending in the Bankruptcy Court, and (b) Lessor shall withdraw Claim No. 14 filed in Bankruptcy Case No. 21-30700 and Claim No. 18 filed in Bankruptcy Case No. 21-30701. As used herein, the term "Business Day" shall mean any day other than a Saturday or Sunday on which commercial banks are open for domestic business in Dallas, Texas.

13.     Upon the Effective Date, Lessee (including Abri and Senior Care Centers) and the Operators each hereby releases and discharges Lessor, New Operator, and HMG, together with each of their respective current or former members, managers, shareholders, directors, officers, employees, successors, agents, attorneys, predecessors, successors, guarantors, parent (including LTC) and subsidiary entities, affiliates, executors, representatives, administrators, family members, heirs, estates, and assigns from any and all of their respective obligations arising from or in any way connected to the Subleases, the Lease or the Facilities arising or accruing at any time from the beginning of the world through the Effective Date; provided, however, that this release shall not be deemed to relinquish or release the obligations of the parties under the terms of this Agreement, including, without limitation, the OTAs and the Escrow Agreement.

14.     Upon the Effective Date, Lessor, LTC, New Operator, and HMG each hereby releases and discharges Senior Care Centers, the Operators and Abri together with each of Abri, the Operators and Senior Care Center's current or former members, managers, shareholders, directors, officers, employees, successors, agents, attorneys, predecessors, successors, guarantors,

parent and subsidiary entities, affiliates, executors, representatives, administrators, family members, heirs, estates, and assigns from any and all of its obligations arising from or in any way connected to the Sublease, the Lease or the Facilities arising or accruing at any time from the beginning of the world through the Effective Date; provided, however, that this release shall not be deemed to relinquish or release the obligations of the parties under the terms of this Agreement, including, without limitation, the OTAs and the Escrow Agreement.

15.     Each party hereto covenants and agrees not to directly or indirectly (or cause or encourage others to) disclose, communicate, publish or engage in publicity, including written, oral and electronic communication of any kind, or any other activity, in each case to the extent that the information disclosed by such action or activity is not generally available to the public, is factually inaccurate and is disclosed with the intent to disparage any other party hereto, its business, or its actions.

16.     Notwithstanding the filing of this Agreement with the Bankruptcy Court, the parties shall not make any public announcement regarding the transition of the Facilities, the OTAs or this Agreement until the later of (i) submission of the Motion for approval by the Bankruptcy Court and (ii) the submission of the Change of Ownership application contemplated by Paragraph 5.

17.     The parties further agree and acknowledge that the terms of this Agreement are contractual and are not merely a recital. This Agreement shall be binding upon, and inure to the benefit of, each party and their heirs, successors, affiliates, subsidiaries, parents, officers, shareholders, directors, managers, members, partners, assigns, agents, servants, employees and attorneys.

18.     This Agreement, and the written agreements referenced herein, contains the full and complete agreement of the parties hereto, and all prior negotiations and agreements pertaining to the subject matter hereof are merged into this Agreement. Each party hereto expressly disclaims reliance upon any facts, promises, undertakings or representations made by any other party, or its/his agents or attorneys, prior to the execution of this Agreement. The parties further acknowledge that they may hereafter discover facts different from or in addition to those which they now know or believe to be true with respect to the claims released herein, and each agrees that in such event, this Agreement shall nevertheless be and remain effective in all respects, notwithstanding such different or additional facts, or the discovery thereof.

19.     This Agreement may not be modified, amended or waived except in a writing signed by all parties hereto. The waiver by one party of any breach of this Agreement by any other party shall not be deemed a waiver of any other prior or subsequent breach of this Agreement.

20.     The parties to this Agreement have had the benefit of counsel of their choice and have been afforded an opportunity to review this Agreement with their chosen counsel. To that end, the parties hereto have been represented by attorneys in negotiating and drafting this Agreement and the parties hereto have influenced the language of this Agreement. Therefore, this Agreement shall not be construed against any party to this Agreement by reason of drafting or authorship.

21.     This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Texas (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such state are superseded by the Bankruptcy Code or other applicable federal law.  The parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. In the event of any litigation to enforce this Agreement that arises after the Bankruptcy Case has been closed, the parties each consent to reopening the Bankruptcy Case pursuant to Section 350(b) of the Bankruptcy Code and shall not contest the reopening of the Bankruptcy Case.

22.     Each party hereto shall bear its own costs, out-of-pocket expenses, and attorneys' fees incurred in the negotiations and execution of this Agreement.

23.     In the event of any litigation to enforce or interpret this Agreement, the substantially prevailing party in such litigation shall be awarded its legal fees and expenses incurred in such action from the substantially non-prevailing party.

24.     All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be (a) given in person, (b) deposited in the United States mail, certified or registered, post-age prepaid, return receipt requested or (c) sent by national overnight courier service, each addressed as follows:

If to Lessee/Operators:

c/o ABRI Health Services, LLC
Attn:   Anthony J. Arnaudy
600 N. Pearl Street, Suite 1950
Dallas, Texas 75201
Email: aarnaudy@abrihs.com
Phone: 619.865.1070

With a copy to:

Polsinelli
Attention: Liz Boydston
2950 N. Harwood, Suite 2100
Dallas, TX 75201
Email: LBoydston@polsinelli.com
Phone: 214.397.0030.

If to Lessor:

c/o LTC Properties, Inc.
Clint Malin, Co-President & Chief Investment Officer and
Pam Kessler, Co-President & Chief Financial Officer
2829 Townsgate Rd., Suite 350
Westlake Village, California 91361
Email:  clint.malin@LTCreit.com  and
Email:  pam.kessler@LTCreit.com
Phone:  805.981.8655

With a copy to:

Leighton Aiken, Esq.
Ferguson Braswell Fraser Kubasta PC
2500 Dallas Parkway, Suite 600
Plano, Texas 75093
Email:  LAiken@FBFK.law
Phone:  469-440-5405

If to HMG:

c/o HMG Healthcare, LLC
1780 Hughes Landing Blvd., Suite 500
The Woodlands, Texas 77380
Attn: Laurence C. Daspit
Email: Laurence.daspit@healthmarkgroup.com

with a copy to:

Underwood Law Firm, P.C.
P.O. Box 9158
Amarillo, Texas 79105
Attn: Gavin J. Gadberry
Email: gavin.gadberry@uwlaw.com

If to New Operator:

Winnie-Stowell Hospital District
538 Broadway
Winnie, Texas 77665
Attn: Edward Murrell
Email:  sherrie@wshd-tx.com

With a copy to:

Benckenstein & Oxford, L.L.P.
3535 Calder Avenue, Suite 300
Beaumont, Texas 77706
Attn:  Hubert Oxford
Email:  hoxfordiv@benoxford.com

Any such notice personally delivered shall be deemed delivered when actually received, any such notice deposited in the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused, and any notice deposited with an overnight courier service for deliver shall be deemed delivered on the business day following such deposit. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

25.     Each party represents and warrants that the person signing on behalf of such party is fully authorized and legally competent to execute this Agreement as the legal, valid and binding act and deed of such party, and is a duly authorized representative of such party.

26.     This Agreement may be executed in one or more counterparts, any one of which shall be considered an original of this Agreement, but all of which shall be considered one and the same instrument.

27.     All parties agree to cooperate fully, execute any and all supplementary documents and take all additional actions which may be reasonably necessary to give full force and effect to the basic terms and intent of this Agreement.

SIGNATURES TO FOLLOW ON SEPARATE PAGES]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Execution Date.

<u>LESSOR</u>:

TXMS Real Estate Investments, Inc.,
a Delaware corporation


By:    _____

Name: Clint Malin

Title:   Co-President and Chief Investment Officer

FOR PURPOSES OF PARAGRAPHS 3, 4, 6, 7, 10 AND 13-27 ONLY.

<u>LTC</u>:

LTC Properties, Inc.,
a Maryland corporation


By:    _____
Name:  Clint Malin
Title:    Co-President and Chief Investment Officer

<u>LESSEE</u>:

Senior Care Centers, LLC,
ABRI Health Services, LLC,
each a Delaware limited liability company


By:     _____
Name:  Anthony Arnaudy
Its:     Chief Financial Officer

<u>OPERATORS</u>:

> Green Oaks SCC LLC,
> Brownwood SCC LLC,
> Crowley SCC LLC,
> Harbor Lakes SCC LLC,
> Stonegate SCC LLC,
> Hewitt SCC LLC,
> Mission SCC LLC,
> Stallings Court SCC LLC,
> Red Oak SCC LLC,
> Community SCC LLC, and
> Holland Lake SCC LLC,
> each a Texas limited liability company,

> By:      _____
> Name:  Anthony Arnaudy
> Its:      Chief Financial Officer

FOR PURPOSES OF PARAGRAPHS 3, 4, 7, 9, 10 AND 13-27 ONLY.
<u>HMG</u>:

HMG Healthcare, LLC,
a Texas limited liability company


By: _____
Name:
Its:

FOR PURPOSES OF PARAGRAPHS 3, 4, 7, 9, 10
AND 13-27 ONLY.
<u>NEW OPERATOR</u>:

Winnie-Stowell Hospital District,
a governmental entity and political subdivision of
the State of Texas organized pursuant to Tex. Const.
Art. IX, § 9 and Chapter 286 of the Health and
Safety Code, as amended


By:    _____
Name:
Its:

SCHEDULE 1

Green Oaks Nursing & Rehab
Senior Care of Brownwood
Crowley Nursing & Rehab
Harbor Lakes Nursing & Rehab
Senior Care of Stonegate
Hewitt Nursing & Rehab
Mission Nursing & Rehabilitation Center
Stallings Court Nursing & Rehab
Red Oak Health and Rehabilitation Center
Senior Care at Stephenville
Senior Care at Holland Lake

EXHIBIT A

Form of OTA

(Attached)

## OPERATIONS TRANSFER AGREEMENT

This Operations Transfer Agreement (**"Agreement"**) is entered into as of _____, 2021 (**"Effective Date"**), by and between Brownwood SCC LLC d/b/a Abri at Brownwood, a Texas limited liability company (**"Operator"**), Winnie-Stowell Hospital District, a governmental entity and political subdivision of the State of Texas organized pursuant to Tex. Const. Art. IX, § 9 and Chapter 286 of the Health and Safety Code, as amended (**"Hospital District"**), and HMG Park Manor of Brownwood, LLC, a Texas limited liability company ("**Manager**").

## RECITALS

A.    Operator subleases the nursing facility known as Abri at Brownwood, located at 2700 Memorial Park Dr., Brownwood, Texas 76801 (**"Facility"**), from Senior Care Centers, LLC and ABRI Health Services, LLC, each a Delaware limited liability company (collectively, "**SCC**"). SCC leases the Facility pursuant to that certain Second Amended and Restated Master Lease Agreement, effective as of August 27, 2013, as amended (the "**SCC Lease**"), between TXMS Real Estate Investments, Inc. ("Landlord") and SCC.

B.    Operator holds a valid and current License (as defined in <u>Article 1</u> below, which contains definitions of the capitalized terms used in this Agreement) from the Texas Health and Human Services Commission ("**HHSC**") to operate the Facility.

C.    Landlord and Manager's affiliate intend to enter into a lease (the "**Prime HMG Lease**") for the Facility with a commencement date of the Transfer Date (as defined herein);

D.    Manager and Hospital District intend to enter into a sublease (**"Sublease"**) for the Facility with a commencement date of the Transfer Date (as defined herein) which will result in Hospital District becoming the licensed operator of the Facility.

E.    Manager and Hospital District intend to enter into a Management Agreement with an effective date of the Transfer Date (the **"Management Agreement"**) whereby Manager will manage the Facility on behalf of Hospital District on and after the Transfer Date, and desire to provide for certain terms and conditions relevant to the orderly transition of certain operational and financial responsibilities for the Facility from Operator to Hospital District and Manager.

F.    The Parties wish to provide for an orderly and lawful transition of the operations of the Facility from Operator to Hospital District in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants of the parties set forth herein, it is hereby agreed:

## AGREEMENT

## ARTICLE 1.   DEFINITIONS

In addition to the other terms defined herein, the following terms shall have the meanings set forth in this <u>Article 1</u>, except as the context otherwise clearly requires:

79390350.15

1.1.     "Accounts" means all Pre-Transfer Accounts and Post-Transfer Accounts.

1.2.     "Affiliates of Operator" means SCC and parties that operate nursing facilities pursuant to the SCC Lease and listed on Exhibit B.

1.3.     "License" shall mean and refer to a current and valid operating license issued by HHSC permitting the Facility's operation as a 90-bed nursing facility.

1.4.     "Resident Trust Property" means and includes any and all resident trust funds and other property held by Operator immediately prior to the Transfer Date for past residents of the Facility.

1.5.     "Post-Transfer Accounts" means all revenues, monies, accounts, payments and other proceeds arising from or related to the operation of the Facility, including without limitation Medicaid-related general intangibles and any other third party payor reimbursements, together with the products and proceeds of all of the foregoing, attributable to the provision of resident services by Hospital District on or after the Transfer Date.

1.6.     "Pre-Transfer Accounts" means all revenues, monies, accounts, payments and other proceeds arising from or related to the operation of the Facility, including without limitation Medicare and Medicaid-related general intangibles and any other third party payor reimbursements, together with the products and proceeds of all of the foregoing, attributable to the provision of resident services by Operator before the Transfer Date.

## ARTICLE 2.    TRANSFER OF OPERATIONS; AGREEMENTS

2.1.     Transfer of Assets and Operations. Subject to the terms and conditions of this Agreement, at 12:00:01 a.m. on October 1, 2021 (the "**Transfer Date**"), Operator shall transfer, assign, and deliver to Hospital District all of Operator's right, title and interest in all of the assets existing on and after the Effective Date and identified in Schedule A to the Bill of Sale (collectively, the "Transferred Assets"), and expressly excluding any excluded assets set forth on Schedule C to the Bill of Sale (the "Excluded Assets"), which Excluded Assets will be the only assets removed from the Facility from and after the Effective Date, on an "AS IS,  WHERE IS" basis but in each case free of any and all liens, security interests and encumbrances (collectively, "Encumbrances"). The assets listed on Schedule B of the Bill of Sale are leased and shall be included in Transferred Assets provided that Operator shall continue to be responsible for any lease payments related to the period before the Transfer Date and Hospital District shall be responsible for any lease payments related to the period on or after the Transfer Date.  Operator shall sell, transfer and convey to Hospital District, without warranty or representation, effective as of the Transfer Date by the execution and delivery to Hospital District of a separate Quit Claim Bill of Sale, in the form attached hereto as Exhibit "A" all of the Transferred Assets (the "Bill of Sale"), which Bill of Sale and its Schedules are incorporated by reference as if set forth full herein. Operator shall not have any obligation to deliver the Transferred Assets to any location other than the Facility, it being understood and agreed that the presence of the Transferred Assets at the Facility on the Transfer Date shall constitute delivery thereof. IT IS EXPRESSLY AGREED THAT HOSPITAL DISTRICT ACCEPTS THE FACILITY, THE DEMISED PREMISES, THE INVENTORY, ANY FURNITURE, FIXTURES AND EQUIPMENT AT THE FACILITY AND

ANY OTHER ASSET, PROPERTY, OR RIGHT TRANSFERRED BY OPERATOR TO HOSPITAL DISTRICT, "AS IS, WHERE IS, AND WITH ALL FAULTS" AS OF THE TRANSFER DATE, SUBJECT HOWEVER TO THE PROVISIONS OF ARTICLE 8, ARTICLE 9 AND ARTICLE 10. EXCEPT AS OTHERWISE PROVIDED HEREIN, OPERATOR HAS NOT MADE ANY REPRESENTATION OR WARRANTY REGARDING ANY OF THE FOREGOING ASSETS, PROPERTY AND RIGHTS OR ANY OTHER MATTER REGARDING OR RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION ARTICLE 10, OPERATOR HEREBY DISCLAIMS, AND HOSPITAL DISTRICT FOREVER WAIVES AND RELEASES, ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE FOREGOING ASSETS, PROPERTY AND RIGHTS OR ANY OTHER MATTER REGARDING OR RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY INCLUDING, BUT NOT LIMITED TO, THE SUITABILITY THEREOF, THE DESIGN OR CONDITION THEREOF, THE MERCHANTABILITY THEREOF, THE FITNESS THEREOF FOR A PARTICULAR PURPOSE, THE PHYSICAL CONDITION THEREOF, THE QUALITY OF WORKMANSHIP THEREOF OR THE CONFORMITY THEREOF TO GOVERNMENTAL REQUIREMENTS, THE OPERATOR'S OWNERSHIP, USE, OPERATION OR MAINTENANCE THEREOF OR OTHERWISE WITH REGARD TO THE OPERATIONS RELATED ASSETS, TANGIBLE OR INTANGIBLE, WHETHER CONVEYED HEREBY, CONTAINED THEREIN, OR RELATED THERETO.

2.2. <u>Assumption of Certain Liabilities</u>. Hospital District, or Manager, as applicable shall assume, perform and discharge the following responsibilities and liabilities effective as of the Transfer Date (collectively, the "**Assumed Liabilities**"):

(i) operations of the Facility on or after the Transfer Date and the provision of residency to the residents of the Facility and all health care, personal care, pharmaceuticals and other goods and services to the residents of the Facility;

(ii) to the extent transferred in accordance with the terms of this Agreement, the responsibilities associated with the resident agreements on or after the Transfer Date;

(iii) the rights and responsibilities arising on or after the Transfer Date associated with the Operator's operating contracts ("**Operating Contracts**") set forth on <u>Exhibit C</u> (the "**Assumed Operating Contracts**") including but not limited to (a) Operator's rights and interests in and to the Medicare provider number and Medicare provider reimbursement agreement of Operator for the Facility; (b) any Operating Contracts (including but not limited to any offsite storage facility Operating Contracts) related to storage of medical, patient or employee records and (c) any Operating Contracts related to utilities as prorated as provided herein;

(iv) to the extent allowed by law, any legal obligations to keep or otherwise store

medical, patient or employee records whether such records relate to the period before or after the Transfer Date in accordance with <u>Article 6</u>;

(v)    All obligations for paid time off (PTO) shall be assumed by Manager (including but not limited to any sick time or vacation time) of all employees of Operator provided such obligations do not exceed $550,000 in the aggregate for the employees of Operator and Affiliates of Operator. <u>Schedule 2.2 (v)</u> reflects an estimate of the accrued and earned PTO for each employee of Operator as of the Effective Date; and

(vi)    Certain obligations for Medicare Advance Payment liabilities as set forth in the Settlement Agreement (as hereinafter defined) the terms of which are incorporated herein by reference. Within ten (10) days of receipt, Operator shall provide Manager copies of Medicare remittance advices on and after the Effective Date reflecting any MAP Liability recoupments.

2.3.    <u>Commercially Reasonable Efforts</u>. In consideration for the agreements of Operator set forth herein, and the full and faithful performance of all of its covenants hereunder, Hospital District agrees to use commercially reasonable efforts to, effective as of the Transfer Date: (a) acquire an operating license and Medicaid certification from HHSC, and (b) complete the transfer of the Medicare Provider Agreement from Operator pursuant to all applicable laws and regulations regarding the same.

2.4.    <u>Cooperation</u>. Each party hereto agrees to reasonably cooperate with the other in effecting a change in operation of the Facility, including but not limited to execution and delivery to Manager of licensure and Medicaid and Medicare certification application documents prior to August 31, 2021, for the purposes of licensing and certification in order to ensure the continuous and uninterrupted operation of the Facility as a licensed skilled nursing facility. Operator agrees not to take any action or allow any omission that would result in the termination or suspension of the existing License or provider agreements. Manager shall have normal course access to the Facility upon the earlier of Bankruptcy Court approval of the Settlement Agreement and the date the application for a change of ownership is filed with the Texas Health and Human Services Commission or other applicable Texas state agency. Before normal course access is granted pursuant to this paragraph, Manager may have supervised access to the Facility provided it gives Operator written notice at least 48 hours before the requested date of supervised access.

2.5.    <u>Conditions</u>. This Agreement and the respective obligations of the parties hereunder are conditioned in all respects upon the following: (a) the payment of $3.25 million dollars to the Operator and certain Affiliates of Operator by the Landlord on the Transfer Date and the fulfillment of the other terms set forth in the settlement agreement by and between, among others, Landlord and SCC and Affiliates of Operator, effective as of the Effective Date (the "**Settlement Agreement**"); (b) approval of a licensure and Medicaid certification application by HHSC filed by the Hospital District no later than August 31, 2021; and (c) approval of this Agreement and the Settlement Agreement by the Bankruptcy Court.

## ARTICLE 3. RESIDENT TRUST FUNDS & OTHER PROPERTY

3.1. <u>Accounting for Resident Trust Property</u>. As of the Transfer Date, Operator shall prepare and deliver to Manager on behalf of the Hospital District and (if required) to HHSC an accounting of all Resident Trust Property. Within ten (10) business days of the Effective Date, Operator shall deliver to Manager on behalf of the Hospital District a final accounting of all Resident Trust Property.

3.2. <u>Transfer of Resident Trust Property</u>. Operator shall remit to Manager on behalf of the Hospital District all Resident Trust Property held by Operator within ten (10) business days of the Effective Date.

3.3. <u>Indemnification for Resident Trust Property</u>. Operator will indemnify, defend and hold Hospital District and its affiliates harmless for, from and against all liabilities, claims and demands, including reasonable attorneys' fees and costs, for inaccuracies in the accounting or for claims with respect to the Resident Trust Funds arising from events which occurred prior to the Transfer Date. Manager, on behalf of the Hospital District, will indemnify, defend and hold Operator harmless for, from and against all liabilities, claims and demands, including reasonable attorneys' fees and costs, for claims with respect to the Resident Trust Funds arising out of events which occurred on or after the Transfer Date.

## ARTICLE 4. RECEIVABLES & REIMBURSEMENTS; PRE-TRANSFER DATE OPERATIONS

4.1. <u>Operator's Reports</u>. Operator shall timely prepare, pursuant to applicable federal and state law, and file its Medicaid and Medicare cost reports and Medicaid Staffing Enhancement reports for its operation of the Facility for the period up to the Transfer Date.

4.2. <u>Accounts Receivable</u>.

4.2.1. <u>Schedule of Pre-Transfer Accounts</u>. Operator shall deliver to Manager on behalf of the Hospital District a complete, correct resident roster with account status, responsible party, payor source and agings prior to the Transfer Date, and shall update such roster as of the Transfer Date.

4.2.2. <u>Pre-Transfer Accounts Receivable</u>. Operator shall retain all right, title and interest in and to all unpaid Pre-Transfer Accounts, including but not limited to accounts receivable arising from rate adjustments which relate to periods prior to the Transfer Date even if such adjustments occur after the Transfer Date, and Operator shall remain liable for any overpayments (including without limitation recapture of pass-throughs) made to Operator for periods prior to the Transfer Date for which payment is due to (or for which subsequent reimbursements are offset or denied by) Medicare, Medicaid or any other third party payor after the Transfer Date. As of the Transfer Date, Operator shall provide Manager on behalf of the Hospital District with a schedule setting forth by resident its outstanding Pre-Transfer Accounts as of the Transfer Date.

4.3. <u>Handling of Receipts</u>. Payments received after the Transfer Date from third party payors, such as Medicare, Medicaid, VA, managed health organizations and insurers, shall be handled as follows:

4.3.1. To the extent such payments indicate on the accompanying remittance advice that they relate to periods prior to the Transfer Date, such payments will be allocated to Operator. If such payments indicate on the accompanying remittance advice, that they relate to periods on or after the Transfer Date, they shall be allocated to Hospital District;

4.3.2. If such payments indicate on the accompanying remittance advice, or are otherwise identifiable from the content of the remittance advice or if Operator and Hospital District agree, that they relate to periods both prior to and after the Transfer Date, the portion thereof which relates to the period on or after the Transfer Date shall be allocated to Hospital District, and the portion thereof that relates to the period prior to the Transfer Date shall be allocated to Operator; and

4.3.3. If such payments fail to indicate the period to which they relate, each of the parties shall make reasonable efforts to identify the period of such payments and, if such payments are still unidentified, then all such unidentified payments received within ninety (90) days following the Transfer Date shall be deemed to relate to the covered resident's unpaid Pre-Transfer Accounts (if any), with any excess applied to reduce any balances due for services rendered after the Transfer Date.

4.4. Private Pay. Any payment received by either party during the first ninety (90) days after the Transfer Date for a private pay resident, Medicaid resident liabilities, or uncovered charges, which fails to designate the period to which it relates, will first be applied to reduce the resident's Pre-Transfer Account balances (if any), with any excess applied to reduce any balances due for services rendered after the Transfer Date provided that the parties have made reasonable efforts to identify the time period for a payment. Thereafter all non-designated payments will first be applied to any Post-Transfer Account balances, with the excess applied to balances due for services rendered by Operator prior to the Transfer Date, if any.

4.5. Misapplication of Payments. In the event that any payment hereunder is misapplied by the parties, except as otherwise provided herein, the party which erroneously received said payment shall remit the same to the other within ten (10) days after month end of the month such determination is made.

4.6. Cooperation in Processing of Claims. If necessary, Manager on behalf of the Hospital District and Operator agree to provide each other, upon request and in a timely manner, with copies of all Medicare and Medicaid reimbursement requests pertaining to the Facility submitted to any Medicare or Medicaid fiscal intermediary whether before or after the Transfer Date. Each party agrees to take all reasonable steps to assist the other in processing Medicare and Medicaid claims and obtaining Medicare and Medicaid payments for services rendered (i) in the case of Hospital District, from and after the Transfer Date, and (ii) in the case of Operator, prior to the Transfer Date.

4.7. Pre-Transfer Date Operations. The parties acknowledge and agree that the Operator shall maintain full control over the operations on the Facility before the Transfer Date including but not limited to the purchase of inventory, capital expenditures and the payment of other normal course expenses related to the operations of the Facility.

4.8.    <u>Pre-Transfer Medicare Billing</u>.  From the Effective Date to the Transfer Date, Operator shall maintain and continue normal-course Medicare billing consistent in all respects with Operator's past practices.

## ARTICLE 5.    EMPLOYEES

5.1.    Operator shall terminate all of the Facility employees effective as of 11:59 pm on the day immediately prior to the Transfer Date. From and after the Transfer Date, Manager shall be responsible for all benefits to the employees of the Facility in accordance with Manager's personnel policies. As between Operator and Manager, Operator shall be responsible for payment of payroll attributable to labor prior to the Transfer Date.

5.2.    On the Transfer Date, Manager will offer employment to at least 90% of the employees of Operator who, as of the Transfer Date, work at the Facility.  Such employees whose employment is offered to be continued by Manager shall be referred to as the "<u>Retained Employees</u>," subject to the election of any such Retained Employee to accept such offer of employment; provided, however, any such continued employment of a Retained Employee by Manager shall be on terms which require at a minimum said Retained Employee to perform comparable services, in a comparable position and at substantially the same base salary as such Retained Employee enjoyed with the Facility prior to the Transfer Date.

5.3.    Manager and Operator acknowledge and agree that the provisions of this Article are designed to ensure that Operator is not required to give notice to the employees of the Facility of the "closure" thereof under the Worker Adjustment and Retraining Notification Act (the "<u>WARN Act</u>") or under any comparable state law. Nothing in this Section, however, shall create any rights in favor of any person not a party hereto, including the employees of Facility, or constitute an employment agreement or condition of employment for any employee of Operator or any affiliate of Operator who is a Retained Employee.

5.4.    Operator agrees that the continued employment of the Retained Employees will be important to the viability of Manager's operations at the Facility. Accordingly, Operator agrees that for a period of one (1) year after the Transfer Date it will not directly or indirectly solicit the employment of any of such Retained Employees during the time that such Retained Employees are employed by Manager, nor shall they take any action (i) to directly or indirectly interfere with their employment relationship with Manager or (ii) to induce them in any manner to terminate their employment relationship with Manager. Operator acknowledges and agrees that Manager would not be fully compensated by damages in the event of a breach or threatened breach by Operator of this provision and accordingly agrees that Manager shall be entitled, without the need to post a bond, to seek an injunction to restrain such violation or threatened violation of this Section 5.4. The provisions of this Section 5.4 shall survive the Transfer Date for a period of one (1) year. The restrictions set forth in this paragraph shall not prohibit any form of general advertising or general solicitation that is not directed at a specific person or the hiring of an individual that has been terminated by the Manager.

**ARTICLE 6.   PRORATIONS**

6.1     _Prorations_. Revenues and expenses pertaining to water, electricity, sewer, gas, telephone, real and personal property taxes and prepaid expenses shall be prorated between the parties as of the Transfer Date.

6.2     _Calculation_. All such prorations shall be made on the basis of actual days elapsed in the relevant accounting or revenue period and shall be based on the most recent information available. Without limiting the foregoing, water, electricity, sewer, gas, telephone and other utility charges shall be based, to the extent practicable, on final meter readings and invoices covering the period of time through the Transfer Date. Utility charges that are not metered and read on the Transfer Date shall be estimated based on prior charges, and shall be re-prorated upon receipt of statements therefore.

**ARTICLE 7.   RECORDS**

7.1.    _Delivery of Records_. On the Transfer Date, all of the records for current and past residents, and other relevant records used or developed in connection with the business conducted at the Facility, and all licenses, agreements, records, reports and information reasonably necessary to continue care for residents at the Facility after the Transfer Date shall remain in the Facility. All electronic medical records and databases (including MDS (Minimum Data Set) history) shall be electronically copied and transmitted to Manager, in readily available format for use in Manager's computer applications.  With respect to resident information, such transfer and delivery shall be in accordance with all applicable laws, rules and regulations governing the transfer of medical and other resident records.

7.2.    _Employee Records._ All active employee records used by Operator in connection with the operation of the Facility immediately prior to the Transfer Date shall remain in the Facility for Manager's use in connection with the operation of the Facility.

7.3.    _Access to Records_.

7.3.1.    Subsequent to the Transfer Date, Hospital District shall allow Operator and its agents and representatives to have reasonable access (upon reasonable prior notice and during normal business hours), to inspect and to make copies of, the books and records and supporting material of the Facility relating to the period prior to the Transfer Date, to the extent reasonably necessary to enable Operator to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns and to verify accounts receivable collections due Operator.

7.3.2.    Operator shall be entitled to remove the originals of any records delivered to Hospital District for purposes of litigation involving a resident or employee to whom such record relates, if (i) an officer of or counsel for Operator certifies that such original must be produced in order to comply with applicable law or the order of a court of competent jurisdiction in connection with such litigation, and (ii) Operator leaves a full and complete copy of such records in the Facility while the originals are in its possession. Any record so removed shall promptly be returned to Hospital District following its use.

7.3.3.  Manager on behalf of the Hospital District agrees to maintain such books, records and other materials comprising records of the Facility's operations prior to the Transfer Date that have been received by Hospital District from Operator or otherwise, including, but not limited to, resident records and records of resident funds, to the extent required by law, but in no event less than three (3) years or the minimum period required by any applicable statute of limitations in force as of the Transfer Date, and shall allow Operator a reasonable opportunity to remove such documents, at Operator's expense, at such time as Hospital District shall decide to dispose of such documents.

7.3.4.  <u>HIPAA Compliance</u>. The parties acknowledge and confirm the Business Associate Agreement entered into by parties and attached hereto as <u>Exhibit D</u>.

## ARTICLE 8.  OPERATING CONTRACTS

8.1  <u>Operating Contracts</u>. Upon reasonable request, Operator shall make available to Hospital District and Manager true, complete and current copies of all Operating Contracts not otherwise provided to Manager prior to the Effective Date. The Operating Contracts are in full force and effect and have not been materially modified, altered or amended as of the Transfer Date. The Operator will notify the Manager on behalf of the Hospital District of any material modifications or changes to any Operating Contract.

## ARTICLE 9.  INDEMNIFICATION; REMEDIES

9.1.  <u>Indemnification by Operator</u>. Without limiting its other duties and obligations hereunder, except as otherwise set forth herein, Operator agrees to indemnify, defend and hold harmless Hospital District and Manager for, from and against any and all loss, costs, penalties, fees, liabilities and expenses, including reasonable attorneys' fees and costs, which it may incur as a result of (i) a breach by Operator of its obligations under this Agreement and (ii) the operation of the Facility prior to the Transfer Date; provided, however, that nothing herein shall be construed as imposing any liability on Operator to indemnify, defend or hold harmless Hospital District or Manager with respect to Hospital District's or Manager's negligence, gross negligence or intentional misconduct from and after the Transfer Date.

9.2.  <u>Indemnification by Hospital District</u>. Without limiting its other duties and obligations hereunder, Hospital District agrees to cause Manager to indemnify, defend and hold harmless Operator for, from and against any and all loss, costs, penalties, fees, liabilities and expenses, including reasonable attorneys' fees and costs, which it may incur as a result of (i) a breach by Hospital District of its obligations under this Agreement and (ii) the operation of the Facility after the Transfer Date; provided, however, that nothing herein shall be construed as imposing any liability on Hospital District or Manager to indemnify, defend or hold harmless Operator with respect to Operator's negligence, gross negligence or intentional misconduct on or before the Transfer Date.

9.3.  <u>Remedies of Hospital District and Manager</u>. The Hospital District and Manager shall have the remedies set forth in the Settlement Agreement.

## ARTICLE 10.  REPRESENTATIONS AND WARRANTIES

10.1.    Power and Authority; Enforceability.  Each party hereby represents and warrants that: (a) it has full power to execute, deliver and perform this Agreement; (b) the execution, delivery and performance of this Agreement by each party does not contravene any applicable provision of any applicable law; and (c) this Agreement constitutes the legal, valid and binding obligation of each party, enforceable against such party in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency and other laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

10.2.    Operator's Warranties.  To induce Hospital District and Manager to enter into this Agreement, the Management Agreement, the Sublease, and all other agreements and documents contemplated hereby, Operator hereby represents and warrants to Hospital District as follows:

10.2.1. Regulatory Matters. To Operator's knowledge as of the Transfer Date, Operator and Affiliates of Operator:

(i)      are not currently under sanction by the Office of Inspector General ("OIG") of the Department of Health and Human Services or barred from federal or state procurement programs and have not been convicted of a criminal offense with respect to health care reimbursement, or battery or neglect of a dependent;

(ii)     are not parties to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services;

(iii)    have no reporting obligations pursuant to any settlement agreement entered into with any governmental entity;

(iv)     have not been the subject of any government payor program investigation conducted by any federal or state enforcement agency, except for Medicaid Resource Utilization Group audits conducted in the normal course of business and/or any civil monetary penalties received in connection with any regulatory survey inspections conducted by HHSC or CMS prior to the Transfer Date, and have implemented a Plan of Correction accepted by HHSC or CMS for any regulatory survey inspections where deficiencies were cited and a CMS form 2567 has been received by Operator.

(v)      have not been a defendant in any *qui tam* or False Claims Act litigation;

(vi)     have not been served with or received any search warrant, subpoena or civil investigative demand, by or from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the operation of the healthcare businesses conducted by Operator); and

(vii)    have not committed an act related to the Facility which is fraudulent or prohibited under the Stark Amendments, any state or federal laws relating to referrals of patients or services, or any other applicable CMS,

Medicaid, or Medicare regulations relating to referrals of patients or services.

10.2.2. <u>No Encumbrances</u>. To Operator's knowledge, as of the Transfer Date, the Transferred Assets are free and clear of all, and not subject to, any Encumbrances.

10.2.3. <u>Leased Personal Property</u>. To Operator's knowledge, the only leased (or rented) assets currently used by Operator in the operation of the Facility are listed on <u>Schedule B</u> or <u>Schedule C</u> to the Bill of Sale. There are no defaults or breaches by Operator or SCC under any lease (or rental agreement) for the leased (or rented) assets listed on <u>Schedule B</u> to the Bill of Sale, and all payments and other amounts owed by Operator or SCC under all such leases (or rental agreements) are paid current as of the Effective Date.

## ARTICLE 11. MISCELLANEOUS

11.1 <u>Further Assurances</u>. Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder, including any reasonable documents required by the Hospital District or its Manager for purposes of working capital financing.

11.2 <u>Notices</u>. All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be (a) given in person, (b) deposited in the United States mail, certified or registered, post-age prepaid, return receipt requested or (c) sent by national overnight courier service, each addressed as follows:

If to Operator:

Brownwood SCC LLC
Attn: Anthony J. Arnaudy
600 N. Pearl Street, Suite 1950
Dallas, Texas 75201
Email: aarnaudy@abrihs.com
Phone: 619.865.1070

With a Copy to:

Polsinelli
Attention: Robert Dempsey
401 Commerce Street, Suite 900
Nashville, TN 37219
Email: rdempsey@polsinelli.com
Phone: 615.259.1512

If to Hospital District:

Winnie-Stowell Hospital District
Attention: Edward Murrell
538 Broadway

Winnie, Texas 77665
Fax: 409.400.4023
Email: sherrie@wshd-tx.com

With a Copy to:

Benckenstein & Oxford, L.L.P.
Attention: Hubert Oxford

3535 Calder Avenue, Suite 300
Beaumont, Texas 77706

Fax: 409.833.8819
Email: hoxfordiv@benoxford.com

If to Manager:

HMG Park Manor of Brownwood, LLC
Attention: Laurence C. Daspit
1780 Hughes Landing Blvd., Suite 500
The Woodlands, Texas 77380
Fax: (281) 419-5527
Email: Laurence.daspit@healthmarkgroup.com

With a copy to:

Underwood Law Firm, P.C.
Attention: Gavin J. Gadberry
P.O. Box 9158
Amarillo, Texas 79105
Fax: (806) 379-0316
Email: gavin.gadberry@uwlaw.com

Any such notice personally delivered shall be deemed delivered when actually received, any such notice deposited in the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused, and any notice deposited with an overnight courier service for delivery shall be deemed delivered on the business day following such deposit. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

11.3   Expenses. Each of the parties shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement.

11.4   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original. Executed counterparts may be delivered by facsimile (and/or Adobe® PDF), and shall be effective when received, with the original copy sent by overnight delivery service.

This Agreement shall be of no force or effect unless and until it has been executed and delivered by both parties.

11.5 <u>Construction</u>. This Agreement has been negotiated by and between Operator, Manager and Hospital District in arms-length negotiations, and all parties are responsible for its drafting. All parties have reviewed this Agreement with appropriate counsel, or have waived their right to do so, and the parties hereby mutually and irrevocably agree that this Agreement shall be construed neither for nor against either party, but in accordance with the plain language and intent hereof. The captions of paragraphs and subparagraphs of this Agreement have been inserted solely for the purposes of convenience and reference, and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

11.6 <u>Controversy</u>. In the event of any controversy, claim or dispute between the parties arising out of or relating to this Agreement, the prevailing party or parties shall be entitled to recover from the non-prevailing party or parties its or their reasonable expenses, including, but not by way of limitation, reasonable attorneys' fees and costs of suit.

11.7 <u>Appplicable Law; Jurisdiction</u>. This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Texas (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such state are superseded by the Bankruptcy Code or other applicable federal law. The parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. In the event of any litigation to enforce this Agreement that arises after the **Bankruptcy** Case has been closed, the parties each consent to reopening the Bankruptcy Case pursuant to Section 350(b) of the **Bankruptcy** Code and shall not contest the reopening of the Bankruptcy Case.

11.8 <u>Waiver</u>. Waiver by one party of the performance of any covenant, condition or promise of the other party shall not invalidate this Agreement, nor shall it be considered to be a waiver by such party of any further or other covenant, condition or promise contained herein. The waiver of either or both parties of the time for performing any act shall not be construed as a waiver of any other act required to be performed at a later date.

11.9 <u>Severability</u>. Should any part of this Agreement be declared invalid for any reason, such decision shall not affect or impair the validity of the remaining part or parts hereof, and this Agreement shall remain in full force and effect as to all parts not declared invalid or unenforceable as if the same had been executed with the invalid or unenforceable portion(s) thereof eliminated.

11.10 <u>Entire Agreement</u>. This Agreement, along with the Lease Termination and Settlement Agreement, comprises the entire agreement between the parties hereto with respect to the subject matter hereof and shall be construed together. This Agreement may not be amended, modified or terminated except by written instrument signed by all of the parties hereto.

11.11 <u>No Unintended Beneficiaries</u>. This Agreement is solely between the parties hereto, and shall not create any right or benefit in any third party, including without limitation any patient, creditor, agent, partner, employee or Affiliate of Operator, or any entity or agency having jurisdiction over the License, the Facility or the operation of the business therein.

79390350.15

11.12 <u>Survival of Obligations, Representations, and Warranties</u>. All provisions herein and all obligations of Operator, Manager and Hospital District pursuant to this Agreement shall survive the Transfer Date.

**Signature Pages Follow**

IN WITNESS WHEREOF, the parties hereby execute this Agreement as of the Effective Date.

**HOSPITAL DISTRICT:**

Winnie-Stowell Hospital District,
a Texas Hospital District

By: _____
Name:  Edward Murrell
Title:   President of the Winnie-Stowell Hospital District Board of Directors

**OPERATOR:**

Brownwood SCC, LLC,
a Texas limited  liability company

By: _____

Name:  Anthony J. Arnaudy

Title:   CFO

**MANAGER:**

HMG Park Manor of Brownwood, LLC,
a Texas limited liability company


By: _____
Name:  Laurence C. Daspit
Title:   Authorized Agent

**EXHIBIT A**

**QUITCLAIM BILL OF SALE**

The party who is a signatory hereto ("**Operator**"), for **TEN DOLLARS ($10.00)** and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, assign, transfer and convey upon Winnie-Stowell Hospital District, a governmental entity and political subdivision of the State of Texas organized pursuant to Tex. Const. Art. IX, § 9 and Chapter 286 of the Health and Safety Code, as amended ("**Hospital District**"), and its successors and assigns forever, right, title and interest of Operator in and to any and all "**Operations-Related Assets**" (as defined herein).

"**Operations-Related Assets**" shall mean those certain items of tangible personal property owned by Operator and now located at that certain Skilled Nursing facility known as [_____], located at [_____] (the "**Facility**") and those certain items of intangible personal property owned by Operator and relating solely to the operation of the Facility each of which are more particularly described on Schedule A and the Leased Transferred Assets described on Schedule B, attached hereto and incorporated herein.  Notwithstanding anything herein to the contrary, the assets listed on Schedule C (the "**Excluded Assets**") attached hereto are expressly excluded from the transfer and conveyance contemplated by this Quitclaim Bill of Sale and no interest whatsoever in the Excluded Assets is hereby transferred to Hospital District.

THE OPERATIONS-RELATED ASSETS ARE BEING TRANSFERRED IN THEIR "AS IS, WHERE IS" CONDITION, WITH NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESS OR IMPLIED, WHETHER OF THE SUITABILITY THEREOF, THE DESIGN OR CONDITION THEREOF, THE MERCHANTABILITY THEREOF, THE FITNESS THEREOF FOR A PARTICULAR PURPOSE, THE PHYSICAL CONDITION THEREOF, THE QUALITY OF WORKMANSHIP THEREOF OR THE CONFORMITY THEREOF TO GOVERNMENTAL REQUIREMENTS, THE OPERATOR'S OWNERSHIP, USE, OPERATION OR MAINTENANCE THEREOF OR OTHERWISE WITH REGARD TO THE OPERATIONS RELATED ASSETS, TANGIBLE OR INTANGIBLE, WHETHER CONVEYED HEREBY, CONTAINED THEREIN, OR RELATED THERETO.

IN WITNESS WHEREOF, Operator has caused this Bill of Sale to be duly executed and delivered to Hospital District effective as of the 1st day of October, 2021 (the "**Transfer Date**")

OPERATOR

[_____],
a Texas limited liability company


By: _____
Name: _____
Title: _____




**HOSPITAL DISTRICT:**

Winnie-Stowell Hospital District,
a Texas Hospital District


By:_____
Name:    Edward Murrell
Title:    President of the Winnie-Stowell
          Hospital District Board of Directors

[Signature Page to Bill of Sale]

Schedule A

Operations-Related Assets

       The Operations-Related Assets shall include only the following owned tangible and intangible personal property relating to and used in connection with the operation of the Facility:

(i)      Post-Transfer Accounts;

(ii)     All computers, computer equipment and hardware, office equipment, parts, supplies and all other tangible personal property owned by Operator or Affiliates of Operator located at the Facility as of July 15, 2021 which are used exclusively in connection with the operation of the Facility;

(iii)    All Assumed Operating Contracts (as defined in the Operations Transfer Agreement dated as of _____, 2021, by and between Operator, Hospital District and Manager);

(iv)    All software licenses related exclusively to the operation of the Facility, if applicable and to the extent assignable (and if licensor consent to such assignment is required, to the extent such consent is granted), subject to any license transfer fees which would be the responsibility of Hospital District;

(v)     All tradenames, trademarks, service marks, domain names (URLs) and websites owned by Operator or Affiliates of Operator (not including SCC) including, without limitation, and all references to any of the foregoing on social media channels (including, without limitation, Facebook, Twitter and YouTube) associated with any or all of the Facility, and any images or videos in any form related to the Facility;

(vi)    All federal, state or municipal licenses, certifications, certificates, approvals, permits, variances, waivers, provider agreements and other authorizations certificates, to the extent assignable, which relate to the operation of the Facility;

(vii)   All assignable guarantees and warranties in favor of Operator with respect to any equipment owned by Operator at the Facility;

(viii)  All telephone and fax numbers used exclusively in connection with the operation of the Facility;

      (ix)    All inventory and supplies located at the Facility operating levels consistent with past practices which will be in sufficient quantities of supplies required by law;

      (x)     All vehicles or trucks utilized at the Facility provided that Manager, on behalf of the Hospital District, has obtained reasonable and appropriate insurance or indemnifies Operator for any post-closing claims related to the vehicles until the titles are transferred;

(xi)    To the extent permitted by applicable law and in accordance with the terms and conditions set forth herein, Operator's rights and interests in and to its provider number and provider and reimbursement agreement under the Medicare and Medicaid programs;

(xii)    Facility records, including patient and medical records and employee personnel and health records as described in the Agreement. As of the Transfer Date, to the extent allowed by law, Manager on behalf of the Hospital District shall assume and be responsible for all medical, patient and employee records related to the Facility (including but not limited to payment for any offsite storage of such records on and after the Transfer Date) whether such records relate to the date before or after the Transfer Date.

<u>Schedule B</u>

<u>Leased Transferred Assets</u>

<u>Schedule C</u>

<u>Excluded Assets</u>

Pre-Transfer Accounts

All Cash related to operations of the Facility before the Transfer Date

All refunds or rebates related to operations of the Facility before the Transfer Date

Tax Benefits and/or Tax Refunds related to operations of the Facility before the Transfer Date provided that Excluded Assets shall only include Tax Refunds for ad valorem taxes to the extent such refund applies to payments for ad valorem taxes for periods before 2021 that the Operator has actually made before the Transfer Date either directly or through funding of a tax escrow.

All Insurance Premium Refunds related to operations of the Facility before the Transfer Date

Any outstanding funds due from Landlord for capital expenditures performed before the Transfer Date provided that Operator will only make capital expenditures before the Transfer Date in the normal course in accordance with Section 4.7 of this Agreement and Operator shall disclose each occurrence of a capital expenditure over $25,000 to Manager.

PharmScripts Medication Carts & Treatment Carts

Paycom Timeclocks

Bank Check Scanners

Patient's Personal Property

Staff's Personal Property

# EXHIBIT B

Affiliates of Operator

**EXHIBIT C**

**Assumed Operating Contracts**

Medicare Provider Agreement related to the Facility;

All Allbridge contracts related to the Facility;

All Kyocera contracts related to the Facility;

All Windstream contracts related to the Facility; and,

All Constellation contracts related to the Facility.

## <u>EXHIBIT D</u>

**Business Associate Agreement**

(Attached)

**SCHEDULE 2.2(v)**

**Estimated Accrued and Earned PTO**

EXHIBIT B

Form of Escrow Agreement

(Attached)

## INDEMNITY CLAIMS ESCROW AGREEMENT

This Indemnity Claims Escrow Agreement (this "**Agreement**") is made and entered into this ___ day of _____, 2021, by and among **TXMS REAL ESTATE INVESTMENTS, INC.**, a Delaware corporation ("**Lessor**"); **LTC PROPERTIES, INC.**, a Maryland corporation ("**LTC**"); **SENIOR CARE CENTERS, LLC** and **ABRI HEALTH SERVICES, LLC**, each a Delaware limited liability company (individually and collectively, "**Lessee**"); **GREEN OAKS SCC LLC**, **BROWNWOOD SCC LLC**, **CROWLEY SCC LLC**, **HARBOR LAKES SCC LLC**, **STONEGATE SCC LLC**, **HEWITT SCC LLC**, **MISSION SCC LLC**, **STALLINGS COURT SCC LLC**, **RED OAK SCC LLC**, **COMMUNITY SCC LLC**, and **HOLLAND LAKE SCC LLC**, each a Texas limited liability company (each, an "**Operator**" and collectively, "**Operators**"); **WINNIE-STOWELL HOSPITAL DISTRICT**, a governmental entity and political subdivision of the State of Texas organized pursuant to Tex. Const. Art. IX, § 9 and Chapter 286 of the Health and Safety Code, as amended ("**Hospital District**"); **HMG PARK MANOR OF GREEN OAKS, LLC**, **HMG PARK MANOR OF BROWNWOOD, LLC**, **HMG PARK MANOR OF CROWLEY, LLC**, **HMG PARK MANOR OF STONEGATE, LLC**, **HMG PARK MANOR OF HARBOR LAKES, LLC**, **HMG PARK MANOR OF HEWITT, LLC**, **HMG PARK MANOR OF MISSION, LLC**, **HMG PARK MANOR OF STALLINGS COURT, LLC**, **HMG PARK MANOR OF RED OAK, LLC**, and **HMG PARK MANOR OF STEPHENVILLE, LLC**, **HMG PARK MANOR OF HOLLAND LAKE, LLC**, each a Texas limited liability company (each, a "**Manager**" and collectively, "**Managers**"); and **[ESCROW HOLDER]**, a _____ _____ ("**Escrow Holder**").

## R E C I T A L S

**A.**     Lessor and Lessee are parties to that certain Second Amended and Restated Master Lease Agreement, effective as of August 27, 2013 (as amended, modified or revised, the "**Lease**") pursuant to which, among other things, Lessee leased from Lessor eleven (11) skilled nursing facilities located in the State of Texas (individually, a "**Facility**," and collectively, the "**Facilities**").

**B.**     Pursuant to sublease agreements, Lessee, as sublessor, leased to Operators, as sublessees, the Facilities.

**C.**     On April 16, 2021 (the "**Petition Date**"), the Lessee filed a voluntary petition for relief under Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* in the Northern District of Texas (the "**Bankruptcy Court**"). The bankruptcy cases (collectively, the "**Bankruptcy Cases**") are being jointly administered under Case No. 21-30700 (sgj).

**D.**     In connection with the settlement of the Bankruptcy Cases, Lessor, LTC, Lessee, Operators, Hospital District and Managers and have entered into that certain Compromise and Release Agreement dated as of the date hereof (as amended, modified or revised, the "**Settlement Agreement**"). Initially capitalized terms used but not otherwise defined in this Agreement shall have meanings given to them in the Settlement Agreement.

**E.**     On the Effective Date, the operations of the Facilities shall be transitioned to Hospital District and Managers pursuant to those certain Operations Transfer Agreements dated as of the Effective Date and entered into among Operators, Hospital District, and Managers (as amended, modified or revised, each, an "**OTA**" and collectively, the "**OTAs**"), all as more particularly described in the Settlement Agreement and OTAs.

**F.** Pursuant to Section 7 of the Settlement Agreement, Lessor, LTC, Lessee, Operators, Hospital District and Managers are entering into this Agreement to, among other things, establish the escrow of funds described herein.

**AGREEMENT:**

**NOW, THEREFORE**, for and in consideration of the mutual promises and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

**1.** **Appointment of Agents**. Each Manager, Hospital District and LTC each hereby appoints Lessor as its respective agent for purposes of delivering notices and otherwise exercising their respective rights under this Agreement. Each Operator hereby appoints Lessee as its respective agent for purposes of delivering notices and otherwise exercising their respective rights under this Agreement. Escrow Agent shall be entitled to rely on any notice or communication from Lessor purporting to be made on behalf of any Manager, Hospital District or LTC as the duly authorized notice or communication of Manager, Hospital District or LTC, as applicable, and Escrow Agent shall be entitled to rely on any notice or communication from Lessee purporting to be made on behalf of any Operator as the duly authorized notice or communication of Operator. The agency appointments made under this Section 1 are made solely for purposes of this Agreement and may not be relied upon in connection with any other matter or by any person other than Escrow Holder.

**2.** **Deposit of Escrow Funds**. Not later than the Effective Date, Lessor or LTC shall deposit by wire transfer of immediately available funds the amount of **FIVE HUNDRED THOUSAND DOLLARS ($500,000)** (the "**Escrow Funds**") with Escrow Holder. Immediately upon its receipt of the Escrow Funds, Escrow Holder shall deposit the Escrow Funds into a separate interest-bearing account and invest the Escrow Funds in a manner selected by Escrow Holder and reasonably approved by Lessor. All interest earned thereon shall be deemed earned by Lessor and Lessor shall provide a W-9 to Escrow Holder, and any other forms required by the Escrow Holder in order to invest the Escrow Funds. The Escrow Funds shall be held in escrow by Escrow Holder in accordance with the terms of this Agreement. Any claims against the Escrow Funds asserted hereunder shall be made subject to and in accordance with the terms and conditions of this Agreement, the Settlement Agreement and the OTAs, including Claims (as defined below) that are not subject to the terms of this Agreement pursuant to Paragraph 4 of the Settlement Agreement.

**3.** **Release of Escrow Funds.**

**(a)** If, upon the expiration of the Claim Period (as defined below), there is not then pending any unpaid or otherwise unresolved Claim Notice (as defined below) with respect to Escrow Funds, then either Lessor or Lessee may give written notice (a "**Termination Notice**") to Escrow Holder and Lessor (if the Termination Notice is given by Lessee) or Lessee (if the Termination Notice is given by Lessor) stating that there is not then pending any unpaid or otherwise unresolved Claim Notice with respect to the Escrow Funds. Upon receipt of a Termination Notice pursuant to this Section 3(a), Escrow Holder shall concurrently deliver a copy thereof to Lessor (if the Termination Notice is given by Lessee) or Lessee (if the Termination Notice is given by Lessor). If within five (5) Business Days after Lessor's or Lessee's, as applicable, receipt of the Termination Notice from Escrow Holder, such party has not given written notice to Escrow Holder that such party disagrees with the Termination Notice, the Termination

2

Notice shall thereupon constitute an irrevocable joint order of all parties to Escrow Holder, and Escrow Holder shall, no later than 2:00 p.m. Central time on the first (1st) Business Day following the expiration of such five (5) Business day period, remit fifty percent (50%) of the then-remaining balance of the Escrow Funds (plus all interest earned thereon) to Lessor and fifty percent (50%) of the then-remaining balance of the Escrow Funds to Lessee, all without any further demand, consent, authorization or agreement by Lessor, Lessee or any other party hereto. As used herein, "**Claim Period**" shall mean, respectively, the period commencing as of the Effective Date and expiring at 5:00 p.m. (Central time) on the date that is two (2) years after the Effective Date.

(**b**) Prior to the expiration of the Claim Period, Lessor, on its own behalf or upon written request to it by either the Hospital District or any Manager, shall have the right to deliver one or more written notices (each a "**Claim Notice**") to Lessee and Escrow Holder setting forth the following matters: (**i**) that (**A**) Lessor has a Claim (as defined below) against the Escrow Funds in accordance with the terms of the Settlement Agreement and this Agreement or (**B**) Hospital District or Manager has a claim against the Escrow Funds in accordance with the terms of any OTA and this Agreement; (**ii**) a description, in reasonable detail, of the nature of the Claim, including applicable Support Documentation; (**iii**) Lessor's, Hospital District's or Manager's, as applicable, good faith reasonable estimate of the portion of the Escrow Funds which it believes it is entitled to withdraw from the Escrow Funds in connection with such Claim (each an "**Estimate**"); and (**iv**) the party (that is, Lessor, Hospital District or the applicable Manager) to whom the payment of the requested Escrow Funds should be made and the wiring instructions of such party. Escrow Holder shall have no obligation whatsoever to review, analyze or interpret any Support Documentation accompanying any Claim Notice. Subject to the terms and conditions of this Agreement, in no event shall Lessor's, Hospital District's or any Manager's receipt of Escrow Funds for any Claim be limited to the amount of such Estimate, and the parties acknowledge that Lessor, Hospital District and Managers are permitted to provide multiple Claim Notices with respect to the same Claim (in the form of updates of such Claim) or different Claims during the Claim Period). Upon Escrow Holder's receipt of a Claim Notice, Escrow Holder shall promptly deliver a full and complete copy of such Claim Notice to Lessee. As used in this Agreement, (**x**) a "**Claim**" shall mean (**i**) a claim by Lessor that it has incurred damages as a result of Lessee's breach of or default under, or that Lessor is entitled to indemnification by Lessee under, the Settlement Agreement, or (**ii**) a claim by Hospital District or any Manager that it has incurred damages as a result of any Operator's breach of or default under, or that Hospital District or any Manager, as applicable, is entitled to indemnification by any Operator under, any OTA; and (**y**) "**Support Documentation**" shall mean such reasonable documents and other writings then in the possession or control of Lessor, Hospital District or a Manager, as applicable, relating to the applicable Claim. The Escrow Funds shall not be divided or allocated between Claims by Lessor under the Settlement Agreement and Claims by Hospital District and Managers under the OTA, and the entire balance of the Escrow Funds at any time shall be available to be disbursed for any Claim pursuant to the provisions of this Agreement.

(**c**) If, within fifteen (15) Business Days after the date on which Escrow Holder shall have delivered a copy of a Claim Notice to Lessee, Lessee shall not have given written notice (a "**Claim Response Notice**") to Escrow Holder that the payment to Lessor, Hospital District or any Manager, as applicable, requested in the applicable Claim Notice is in dispute, the Claim Notice shall constitute an irrevocable joint order of all parties to Escrow Holder: (**i**) to pay over to Lessor, Hospital District or a Manager, as applicable, from the Escrow Funds the portion thereof equal to the Estimate set forth in the applicable Claim Notice (it being understood that if the applicable

3

Claim Notice is an update of a previous Claim Notice, Escrow Holder shall not pay over any portion of the Estimate that has been previously paid over under a previously submitted Claim Notice); and **(ii)** to retain the remaining balance of the Escrow Funds in escrow subject to the provisions of this Agreement. Escrow Holder shall make each payment required hereunder with respect to the applicable Claim not later than 2:00 p.m. Central time on the first (1st) Business Day following the expiration of the referenced fifteen (15) Business Day period, all without need of any further demand, consent, authorization or agreement by Lessor, Lessee or any other party.

(**d**) If, however, within fifteen (15) Business Days after the date on which Escrow Holder shall have delivered a copy of a Claim Notice to Lessee, Lessee shall have delivered a Claim Response Notice to Escrow Holder and Lessor that the payment requested in the applicable Claim Notice is in dispute, then the Claim Response Notice shall constitute an irrevocable joint order of all parties to Escrow Holder: **(i)** to pay over to Lessor, Hospital District or a Manager, as applicable, from the Escrow Funds the UNDISPUTED portion of the Estimate, if any; **(ii)** to retain in escrow the DISPUTED portion of the Estimate (each a "**Disputed Claim Portion**"); and **(iii)** to retain the remaining balance of the Escrow Funds in escrow subject to the provisions of this Agreement. Escrow Holder shall make any such required payment not later than 2:00 p.m. Central time on the first (1st) Business Day following the expiration of the referenced fifteen (15) Business Day period, all without need of any further demand, consent, authorization or agreement by Lessor, Lessee or any other party. Lessee shall not dispute the payment of all or any portion of any Claim from the Escrow Funds except in good faith. Any Disputed Claim Portion of any Estimate shall be retained in escrow by Escrow Holder until the earlier of either **(x)** the date of settlement of the Disputed Claim Portion of the Estimate by mutual written agreement of Lessor and Lessee, in which event Escrow Holder will deliver the applicable Escrow Funds in accordance with such mutual written instructions, or **(y)** a final, non-appealable order of the Bankruptcy Court or other court of competent jurisdiction pursuant to Section 8(g) with respect to such dispute, in which event Escrow Holder will deliver the Disputed Claim Portion of such Escrow Funds in accordance with the terms of said judgment. In connection with any attempted settlement of any Disputed Claim Portion by Lessor and Lessee pursuant to the foregoing clause (x), Lessor, Hospital District and Managers shall each provide such additional or updated Support Documentation related to the applicable Claim as may be reasonably requested by Lessor or Lessee, to the extent within such party's possession or control.

(**e**) Upon the expiration of the Claim Period, the then-remaining Escrow Funds, if any, other than any Disputed Claim Portion, shall be subject to disbursement to Lessor and Lessee pursuant to the provisions of Section 3(a). Notwithstanding the foregoing, if, upon expiration of a Claim Period, Escrow Holder has previously received a Claim Notice for which any applicable fifteen (15) Business Day period referred to in Section 3(c) or 3(d) has not yet expired, Escrow Holder shall retain any Escrow Funds subject to the applicable Claim Notice pending the expiration of the applicable fifteen (15) Business Day periods, which Escrow Funds shall then be disbursed or retained by Escrow Holder pursuant to the relevant provisions of Section 3(c) or 3(d), as applicable. In the event Escrow Holder is holding a Disputed Claim Portion upon the expiration of the Claim Period, Escrow Holder shall hold such Disputed Claim Portion in escrow until one of the conditions of Section (3)(d)(x) or (y) have occurred.

**4.** **Payments by Escrow Holder; No Replenishment.** Each payment made by Escrow Holder hereunder shall be made via wire transfer based upon wire transfer instructions provided to Escrow Holder by the recipient of the applicable portion of the Escrowed Funds. Notwithstanding anything to the contrary herein, none of LTC, Lessor or Lessee, or any of their

respective Affiliates, shall have any obligation to replenish the Escrow Funds if such funds are exhausted by Claims paid by Escrow Holder pursuant to the terms of this Agreement.

 5. **Rights and Responsibilities of Escrow Holder.**

 **(a)** The fees, costs and expenses of Escrow Holder in connection with administering the Escrow Funds under this Agreement shall be borne equally by Lessor and Lessee and shall be payable promptly after demand therefor by Escrow Holder. Escrow Holder shall be entitled to rely upon, and, except in the case of its gross negligence, bad faith, or willful misconduct, shall be fully protected from all liability, loss, cost, damage or expense in acting or omitting to act pursuant to, any instruction, order, judgment, certification, affidavit, demand, notice, opinion, instrument or other writing delivered to it hereunder without being required to determine the authenticity of such document, the correctness of any fact stated therein, the propriety of the service thereof or the capacity, or the identity or authority of any party purporting to sign or deliver such document.

 **(b)** The duties of Escrow Holder are only as herein specifically provided, and are purely ministerial in nature. Escrow Holder shall neither be responsible for or under, nor chargeable with knowledge of, the terms and conditions of any other agreement, instrument or document in connection herewith, including, without limitation, any terms or conditions set forth in the Settlement Agreement or the OTAs, and shall be required to act in respect of the Escrow Funds only as expressly provided in this Agreement. In furtherance of and without limiting the generality of the foregoing, Escrow Holder shall incur no liability whatsoever in respect of its selection in accordance with Section 2 of investments of the Escrow Funds, including, without limitation, any liability for the rate or timing of the returns thereof resulting from fluctuations in market conditions or otherwise, or for prices resulting from the need to liquidate an investment prior to maturity.

 **(c)** Escrow Holder is acting as a stakeholder only with respect to the Escrow Funds. If any dispute arises as to whether Escrow Holder is obligated to deliver the Escrow Funds or as to whom the Escrow Funds are to be delivered or the amount thereof, Escrow Holder shall not be required to make any delivery, but in such event Escrow Holder may **(i)** hold the Escrow Funds until receipt by Escrow Holder of instructions in writing, signed by all parties which have, or claim to have, an interest in the Escrow Funds, directing the disposition of the Escrow Funds, **(ii)** hold the Escrow Funds until receipt of a certified copy of a final judgment of a court of competent jurisdiction providing for the disposition of the Escrow Funds, or **(iii)** institute an interpleader action in, and deposit the Escrow Funds in the registry of, a court of competent jurisdiction; provided, however, that notwithstanding the foregoing, Escrow Holder may, but shall not be required to, institute legal proceedings of any kind. In the event that the Escrow Holder files an action of interpleader naming the parties hereto in, and places the Escrow Funds in the registry of, a court of competent jurisdiction, the Escrow Holder shall be released and relieved from any and all further obligation and liability hereunder or in connection herewith. Lessor and Lessee, jointly and severally, shall indemnify, defend and hold harmless Escrow Holder from and against any loss, cost, liability or other expense in connection with its service as Escrow Holder hereunder, except to the extent arising from the gross negligence, bad faith, or intentional misconduct of Escrow Holder.

 **(d)** Lessor and Lessee reserve the right, at any time and from time to time, to substitute a new escrow agent in place of Escrow Holder pursuant to a writing executed by both

Lessor and Lessee which shall contain instructions to Escrow Holder regarding disbursement or transfer of the Escrow Funds, or the then-remaining portion thereof, to the new escrow agent.

      **6.**      **Notices.** Any notice, consent or other communication permitted or required by this Agreement shall be in writing, and shall be given to each party, at the address set forth below, in the following manner: **(a)** personal delivery, **(b)** reputable overnight delivery service with proof of delivery, or **(c)** email delivery (provided that if delivery is made by email, such notice, consent or other communication shall also be concurrently transmitted by one of the methods described in the foregoing clauses (a) and (b). Each such notice shall be deemed to have been given upon receipt or refusal to accept delivery. Unless and until changed as provided below, the addresses for notices given pursuant to this Agreement shall be as follows:

| To Lessor or LTC: | To Lessee or Operators: |
|---|---|
| c/o LTC Properties, Inc.<br>2829 Townsgate Road, Suite 350<br>Westlake Village, CA 91361<br>Attn: Co-President and Chief Investment Officer<br>Email: clint.malin@ltcreit.com<br>Attn: Co-President and Chief Financial Officer<br>Email: pam.kessler@ltcreit.com | c/o ABRI Health Services, LLC<br>600 N. Pearl Street, Suite 1950<br>Dallas, Texas 75201<br>Attn: Anthony J. Arnaudy<br>Email: aarnaudy@abrihs.com |
| With a copy to: | With a copy to: |
| Ferguson Braswell Fraser Kubasta PC<br>2500 Dallas Parkway, Suite 600<br>Plano, Texas 75093<br>Attn: Leighton Aiken, Esq.<br>Email: LAiken@FBFK.law | Polsinelli<br>401 Commerce Street, Suite 900<br>Nashville, TN 37219<br>Attention: Robert Dempsey<br>Email: rdempsey@polsinelli.com |
| To Managers: | To Hospital District: |
| c/o Healthmark Group<br>1780 Hughes Landing Blvd., Suite 500<br>The Woodlands, Texas 77380<br>Attn: Laurence C. Daspit<br>Email: Laurence.daspit@healthmarkgroup.com | Winnie-Stowell Hospital District<br>538 Broadway<br>Winnie, Texas 77665<br>Attn: Edward Murrell<br>Email: sherrie@wshd-tx.com |
| With a copy to: | With a copy to: |
| Underwood Law Firm, P.C.<br>P.O. Box 9158<br>Amarillo, Texas 79105<br>Attn: Gavin J. Gadberry<br>Email: gavin.gadberry@uwlaw.com | Benckenstein & Oxford, L.L.P.<br>3535 Calder Avenue, Suite 300<br>Beaumont, Texas 77706<br>Attn: Hubert Oxford<br>Email: hoxfordiv@benoxford.com |

To Escrow Holder:

_____
_____
_____
Attn: _____
Email: _____

With a copy to:

_____
_____
_____
Attn: _____
Email: _____

Each party shall have the right to designate a different individual, address email address for notices under this Agreement by giving a notice in writing to the other party in the manner provided above at least five (5) Business Days prior to the effective date of the change.

7. **Effectiveness of Agreement**. The parties acknowledge that the terms and conditions of this Agreement are expressly conditioned upon the occurrence of the Effective Date under the Settlement Agreement.

8. **Miscellaneous**.

(a) The parties further agree and acknowledge that the terms of this Agreement are contractual, and are not merely a recital.

(b) This Agreement may not be assigned in whole in part **(i)** by any of Lessor, LTC, Hospital District or any Manager without the prior written consent of Lessee, which may be granted, conditioned or withheld in Lessee's sole and absolute discretion or **(ii)** by any of Lessee or any Operator without the prior written consent of Lessor, which may be granted, conditioned or withheld in Lessor's sole and absolute discretion. Subject to the foregoing, this Agreement shall be binding upon, and inure to the benefit of, each party and their heirs, successors, affiliates, subsidiaries, parents, officers, shareholders, directors, managers, members, partners, assigns, agents, servants, employees and attorneys.

(c) This Agreement, and the written agreements referenced herein, contains the full and complete agreement of the parties hereto, and all prior negotiations and agreements pertaining to the subject matter hereof are merged into this Agreement. Each party hereto expressly disclaims reliance upon any facts, promises, undertakings or representations made by any other party, or its/his agents or attorneys, prior to the execution of this Agreement. The parties further acknowledge that they may hereafter discover facts different from or in addition to those which they now know or believe to be true with respect to the claims released herein, and each agrees that in such event, this Agreement shall nevertheless be and remain effective in all respects, notwithstanding such different or additional facts, or the discovery thereof.

(d)    The terms and conditions of this Agreement, constitute a contemporaneous, single, integrated transaction and are not several, such that a determination that one or more of such provisions is not enforceable shall render this Agreement null and void, thereby returning the parties to the status quo in effect immediately prior to this Agreement.

(e)    This Agreement may not be modified, amended or waived except in a writing signed by all parties hereto.  The waiver by one party of any breach of this Agreement by any other party shall not be deemed a waiver of any other prior or subsequent breach of this Agreement.

(f)    The parties to this Agreement have had the benefit of counsel of their choice and have been afforded an opportunity to review this Agreement with their chosen counsel.  To that end, the parties hereto have been represented by attorneys in negotiating and drafting this Agreement and the parties hereto have influenced the language of this Agreement.  Therefore, this Agreement shall not be construed against any party to this Agreement by reason of drafting or authorship.

(g)    This Agreement, and the rights and obligations of the parties hereto, shall be governed, construed, interpreted and enforced in accordance with the domestic substantive laws of the State of Texas, without giving effect to any choice or conflicts of law provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.  The parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the person or forum non conveniens.

(h)    Each party hereto shall bear its own costs, out-of-pocket expenses, and attorneys' fees incurred in the negotiations and execution of this Agreement.  In the event of any litigation to enforce or interpret this Agreement, the substantially prevailing party in such litigation shall be awarded its legal fees and expenses incurred in such action from the substantially non-prevailing party.

(i)    Each party represents and warrants that the person signing on behalf of such party is fully authorized and legally competent to execute this Agreement as the legal, valid and binding act and deed of such party, and is a duly authorized representative of such party.

(j)    This Agreement may be executed in one or more counterparts, any one of which shall be considered an original of this Agreement, but all of which shall be considered one and the same instrument.  Electronic, pdf and scanned signatures and signature pages may be attached to an original of this document and shall be deemed to be originals and a part thereof.

(k)    All parties agree to cooperate fully, execute any and all supplementary documents and take all additional actions which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

*[Remainder of page intentionally blank; signature pages follow.]*

       **IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

**LESSOR:**

**TXMS REAL ESTATE INVESTMENTS, INC.,**
a Delaware corporation

By:_____
Name:_____
Title:_____

**LTC:**

**LTC PROPERTIES, INC.,**
a Maryland corporation

By:_____
Name:_____
Title:_____

*[Signatures continue on following page.]*

**HOSPITAL DISTRICT:**

**WINNIE-STOWELL HOSPITAL DISTRICT**,
a governmental entity and  political subdivision of
the State of Texas organized pursuant to Tex.
Const. Art. IX, § 9 and Chapter 286 of the Health
and Safety Code, as amended

By: _____

Name: _____

Title: _____

*[Signatures continue on following page.]*

**<u>MANAGERS</u>:**

**HMG PARK MANOR OF GREEN OAKS, LLC**,
**HMG PARK MANOR OF BROWNWOOD, LLC**,
**HMG PARK MANOR OF CROWLEY, LLC**,
**HMG PARK MANOR OF STONEGATE, LLC**,
**HMG PARK MANOR OF HARBOR LAKES, LLC**,
**HMG PARK MANOR OF HEWITT, LLC**,
**HMG PARK MANOR OF MISSION, LLC**,
**HMG PARK MANOR OF STALLINGS COURT, LLC**,
**HMG PARK MANOR OF RED OAK, LLC**,
**HMG PARK MANOR OF STEPHENVILLE, LLC**,and
**HMG PARK MANOR OF HOLLAND LAKE, LLC**,
each a Texas limited liability company

By: _____
Name: _____
Title: _____

*[Signatures continue on following page.]*

**LESSEE:**

**SENIOR CARE CENTERS, LLC**, and
**ABRI HEALTH SERVICES, LLC**,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**OPERATORS**:

**GREEN OAKS SCC LLC,**
**BROWNWOOD SCC LLC,**
**CROWLEY SCC LLC,**
**HARBOR LAKES SCC LLC,**
**STONEGATE SCC LLC,**
**HEWITT SCC LLC,**
**MISSION SCC LLC,**
**STALLINGS COURT SCC LLC,**
**RED OAK SCC LLC,**
**COMMUNITY SCC LLC**, and
**HOLLAND LAKE SCC LLC**,
each a Texas limited liability company

By: _____
Name: _____
Title: _____

*[Signatures continue on following page.]*

**ESCROW HOLDER:**

**[ESCROW HOLDER],**
a _____ _____


By: _____
Name: _____
Title:  _____


*[End of signatures pages.]*